[This decision has been published in *Ohio Official Reports* at 92 Ohio St.3d 245.]

THE STATE OF OHIO, APPELLEE, *v*. SANDERS, N.K.A. HASAN, APPELLANT.

[Cite as *State v. Sanders*, 2001-Ohio-189.]

*Criminal law—Murder of correctional officer during prison riot—Death penalty upheld, when—Authorities in lawful charge of prison have no duty to "negotiate in good faith" with inmates who have seized the prison and taken hostages—Failure of authorities to negotiate is not an available defense to inmates charged with the murder of a hostage.*

(No. 98-1209—Submitted February 27, 2001—Decided July 18, 2001.)

APPEAL from the Court of Appeals for Hamilton County, No. C-960253.

———————————

SYLLABUS OF THE COURT

The authorities in lawful charge of a prison have no duty to "negotiate in good faith" with inmates who have seized the prison and taken hostages, and the failure of those authorities to negotiate is not an available defense to inmates charged with the murder of a hostage.

———————————

MOYER, C.J.

{¶ 1} During the 1993 prison riot at the Southern Ohio Correctional Facility ("SOCF") at Lucasville, Correctional Officer Robert Vallandingham was murdered on the orders of appellant, Carlos Sanders (n.k.a. Siddique Abdullah Hasan). Sanders was convicted of aggravated murder and sentenced to death.

Facts

{¶ 2} In 1993, the Department of Rehabilitation and Correction ("DRC") ordered that all prison inmates be tested for tuberculosis. Sanders was the acknowledged imam (spiritual leader) of a group of Muslims at SOCF. He protested DRC's order, claiming that the testing method violated Islamic law. On

April 5, 1993, Arthur Tate, Jr., SOCF's warden, met with Sanders. When Tate explained that the test was to be administered to all inmates, Sanders replied: "You do what you have to do and we'll do what we have to do." Shortly thereafter, the warden informed Sanders in writing that all inmates would be tested.

{¶ 3} On April 11, 1993, Muslim inmates staged an uprising and took control of unit L-6 of cellblock "L" ("L-Block") of the prison. Sanders planned and led the takeover.

{¶ 4} Several guards, including Vallandingham, were taken hostage. Vallandingham had locked himself into a restroom, but inmates battered down the door and captured him. Sanders handcuffed Vallandingham and led him away. Other hostages included Officers Clark, Dotson, Hensley, and Nagel. Sanders ordered that all hostages be taken to Unit L-6 and that captured guards be protected for the time being.

{¶ 5} Three factions emerged as the dominant forces in L-Block: the Muslims, led by Sanders; the Aryan Brotherhood, a white racist group, led by Jason Robb and George Skatzes; and the Black Gangster Disciples, a prison gang, led by Anthony Lavelle. Each faction controlled its own section of L-Block; the Muslims controlled unit L-6, and also the hallways.

{¶ 6} The rioters held L-Block until they surrendered on April 21. DRC representatives opened negotiations with the inmates, who periodically threatened to kill hostages if their demands were not met.

{¶ 7} On Wednesday, April 14, there was a meeting of inmate leaders, including Lavelle, Robb, and Sanders. The group discussed killing a guard and, without dissent, decided to do it. But after the meeting, Lavelle told Sanders that he did not think that killing a guard would accomplish anything. Sanders agreed that they should "hold off" on killing a guard that day.

{¶ 8} Later that day, news media quoted a DRC employee's statement suggesting that the inmates were bluffing. This infuriated the inmates. Another

2

leadership meeting followed; Sanders, Robb, Skatzes, and Lavelle were there. Also present were inmate Roger Snodgrass, inmate David Lomache, who helped care for injured guards, and Muslim inmate Reginald Williams. (Lavelle, Snodgrass, Lomache, and Williams later turned state's evidence and recounted the discussion in trial testimony.) To prove that they were serious, the group decided to issue an ultimatum and, if the authorities failed to comply, to kill a guard.

{¶ 9} According to Snodgrass and Williams, Sanders and Robb were "the decision makers" and led this meeting. While accounts differed on whether a formal vote was taken, the testimony indicated that Sanders supported killing a guard. According to Lavelle, "[W]e all agreed that a person from each group * * * would participate" in the killing, and Sanders pledged that his security officers would select a Muslim inmate to take part.

{¶ 10} On the night of April 14, around 9:00 or 10:00 p.m., inmate Miles Hogan overheard Skatzes and inmate Stanley Cummings tell Sanders "about somebody that was supposed to kill a correctional officer [and] had backed out of it." Sanders said he was "sick of the m***********s saying they was going to do something and then back[ing] out of it at the last minute." Cummings said he "would make sure this got done," and Sanders replied: "Well somebody'd better do it."

{¶ 11} Another meeting was held on Thursday morning, April 15. Reginald Williams did not attend this meeting, but he was nearby when it broke up. He heard Muslim inmate James "Namir" Were proclaim loudly that "he would take care of it." Sanders told Were to calm down.

{¶ 12} That morning, inmate Kenneth Law was in L-6 when he saw inmates Alvin Jones and Darnell Alexander escort a bound, blindfolded Vallandingham to the L-6 shower area. Then Law heard Sanders tell Were to "take care of his business" if Sanders "didn't get back with [Were] in half an hour." Sanders then left.

{¶ 13} Were, Jones, and Alexander proceeded to the shower area where Vallandingham was being held. Kenneth Law followed them. When they arrived, Were told Jones and Alexander to "take care of your business." As Were and Law looked on, Jones and Alexander strangled Vallandingham. His body was later dumped outside.

{¶ 14} After the murder, another meeting was held. Someone reported a rumor that Vallandingham was not dead. Were said that "if it is not done right, you don't have anybody to blame but [Were]." According to Lavelle, Were addressed this remark specifically to Sanders.

{¶ 15} Later, Kenneth Law overheard an inmate ask Sanders: "Why was the guard killed?' Sanders said: "It was one or many."

{¶ 16} Inmate Bruce Harris had been locked in a cell on Sanders's orders. On April 21, the last day of the takeover, Harris disrupted a prayer session by shouting and throwing things from his cell. According to inmate Stacy Gordon, Sanders ordered Harris killed for this. Gordon, Reginald Williams, and other Muslim inmates proceeded to kill Harris.

{¶ 17} On April 21, 1993, the inmates surrendered, bringing the riot to an end.

Indictment, Trial, and Sentence

{¶ 18} The Scioto County Grand Jury returned a series of indictments against various inmates for crimes committed during the takeover and siege. One of these indictments charged Sanders with two aggravated murder counts with regard to Robert Vallandingham and one aggravated murder count with regard to Bruce Harris. All three counts carried death specifications. Sanders was also charged with various counts against other officers.

{¶ 19} After two changes of venue, the case was tried to a jury in Hamilton County. The state withdrew several felonious and assault counts.

{¶ 20} The jury convicted Sanders of the aggravated murder of Vallandingham, with three death specifications: murder while under detention, R.C. 2929.04(A)(4); course of conduct, R.C. 2929.04(A)(5); and felony-murder (kidnapping), R.C. 2929.04(A)(7). He was acquitted of the aggravated murder of Harris and of one count of felonious assault upon Dotson, and convicted of all other counts. After a penalty hearing, the jury recommended, and the judge imposed, a death sentence for the aggravated murder of Robert Vallandingham. The court of appeals affirmed the judgment of the trial court in all respects.

{¶ 21} Sanders's appeal is now before us. We have considered each of his thirty-four propositions of law. We have also independently reviewed his death sentence, as R.C. 2929.05(A) requires, by reweighing the felony-murder aggravating circumstance against the mitigating factors and measuring the sentence in this case against sentences imposed in similar cases. We conclude that Sanders's convictions and death sentence should be affirmed.

## I. Jury Issues

{¶ 22} In his eighth, ninth, tenth, twelfth, and thirteenth propositions of law, Sanders raises issues pertaining to the selection and conduct of the jury.

## A. Motion to Dismiss Venire

{¶ 23} On voir dire, a venireman said he could not be fair because Sanders's name and garb reminded him of Louis Farrakhan, whom the venireman regarded as an anti-white, anti-American racist. The venireman was excused for cause. However, when the venireman gave these responses, nine other veniremen were in the courtroom. Four of those nine served on the jury. Sanders's request that the venire be dismissed was overruled. In his eighth proposition, Sanders claims that the venireman's statements biased these jurors, invalidating the jury's verdict.

{¶ 24} However, nothing in the record indicates that the statements at issue biased the other veniremen. The usual way to find out whether a venireman harbors bias is voir dire, and Sanders could have asked that the trial court either question

the other veniremen on this point, or permit the parties to do so. But Sanders made no such request.

**{¶ 25}** We decline to presume that the other veniremen were biased by hearing the remarks at issue. Although bias was presumed in similar circumstances in *Mach v. Stewart* (C.A.9, 1997), 137 F.3d 630, we find *Mach* distinguishable. There, the venireman made repeated, definite statements of opinion concerning a matter germane to the trial—a matter in which she also appeared to be an expert. In this case, the venireman expressed only personal opinions, did not speak at length, and was immediately excused for cause. See *State v. Doerr* (1998), 193 Ariz. 56, 62, 969 P.2d 1168, 1174; *Lucero v. Kerby* (C.A.10, 1998), 133 F.3d 1299, 1308-1309.

**{¶ 26}** Sanders also argues that the trial court should have given either a cautionary instruction to neutralize the effect of the venireman's statements or questioned the other veniremen to determine whether the comments had affected their impartiality. However, at trial he did not ask the court to take such measures. Thus, he has waived his claim that such measures should have been taken.

**{¶ 27}** Sanders's eighth proposition is overruled.

### B. Excusal for Cause

**{¶ 28}** The trial court excused a venireman for cause because she stated on voir dire that she could not do without a cigarette for any length of time. In his ninth proposition, Sanders claims that excusing the venireman for this reason was error. However, an erroneous excusal for cause, on grounds other than the venireman's views on capital punishment, is not cognizable error, since a party has no right to have any particular person sit on the jury. Unlike the erroneous denial of a challenge for cause, an erroneous excusal cannot cause the seating of a biased juror and therefore does not taint the jury's impartiality.[1]

---

1. See, *e.g.*, *United States v. Cornell* (C.C.D.R.I.1820), 25 F. Cas. 650, 656; *United States v. Brooks* (C.A.8, 1999), 175 F.3d 605, 606; *Jones v. State* (Tex.Crim.App.1998), 982 S.W.2d 386, 392 (citing

**{¶ 29}** In any event, excusing this venireman was within the trial court's discretion. Crim.R. 24(B) provides:

"A person called as a juror may be challenged for the following causes:

"* * *

"(14) That he is otherwise unsuitable for any other cause to serve as a juror."

**{¶ 30}** The venireman admitted that she is an "inveterate" smoker who "get[s] very upset" when she cannot smoke and that it would be "almost impossible to go for any length" without a cigarette. It is likely that such a juror would be inattentive during trial and bring an attitude less than judicious to deliberations, and would thus be "unsuitable" to serve as a juror under Crim.R. 24(B)(14).

**{¶ 31}** Moreover, the trial court was under no obligation to accommodate the juror with smoking breaks, as Sanders suggests. Frequent breaks would have prolonged the trial and disrupted the presentation of evidence. Moreover, the juror could not take smoking breaks outside the jury room after submission of the case, for "R.C. 2945.33 and Crim.R. 24(G) clearly contemplate that jurors in capital cases generally must not be permitted to separate during their * * * deliberations." *State v. Davis* (1992), 63 Ohio St.3d 44, 47-48, 584 N.E.2d 1192, 1195-1196. Sanders's ninth proposition is overruled.

cases); *State v. Mendoza* (1999), 227 Wis.2d 838, 863, 596 N.W.2d 736, 748, fn. 15 (citing cases). Contra *United States v. Salamone* (C.A.3, 1986), 800 F.2d 1216; *People v. Lefebre* (Colo.2000), 5 P.3d 295.

C. Representativeness of Jury

{¶ 32} In his tenth proposition, Sanders contends that the Hamilton County Jury Commissioner used a procedure that placed nearly three-fourths of minority veniremen in the second half of the venire. This, according to Sanders, denied him equal protection, due process, and the right to trial by an impartial jury.

{¶ 33} Sanders contends that, although he was not entitled to a petit jury that reflected a representative cross-section of the community, see, *e.g.*, *Lockhart v. McCree* (1986), 476 U.S. 162, 173-174, 106 S.Ct. 1758, 1765, 90 L.Ed.2d 137, 147-148, he was entitled to a "fair possibility" of obtaining such a jury.[2]  See *Williams v. Florida* (1970), 399 U.S. 78, 100, 90 S.Ct. 1893, 1906, 26 L.Ed.2d 446, 460; *United States ex rel. Teague v. Lane* (C.A.7, 1985), 779 F.2d 1332, 1334 (Cudahy, J., dissenting).  And he claims that the system used by the jury commissioner "precluded the possibility of securing a representative jury."

{¶ 34} Sanders's claim centers on the method used to assign juror numbers. The jury commissioner gave numbers to prospective jurors based on the order in which they returned their completed questionnaires, *i.e.*, the first to do so was designated Juror No. 1, and so forth.  However, when a venireman returned the questionnaire, the jury commissioner (or his subordinate, the jury coordinator) would review it; if he found any omissions, he would return it to the venireman for completion.[3]  Thus, a venireman would be assigned a number only after returning a *completed* questionnaire.

{¶ 35} According to Sanders, this system clusters minority jurors near the end of the venire, where they are less likely to be called for voir dire and hence less

---

2. Sanders does not claim that the *venire* failed to reflect a fair cross-section of the community, as required by *Duren v. Missouri* (1979), 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579.

3.  They also returned questionnaires to veniremen who asked them to.  Jury coordinator Robert Grauvogel testified that "sometimes somebody will come back in and say, I don't know whether I answered this question right, so we have to go back and find theirs and give it back and they answer again."

likely to become jurors. (Sanders's argument seems to assume that prospective jurors were called for voir dire in order of their juror numbers. Although the record does not make that clear, the state has not disputed it.)

**{¶ 36}** At trial, Sanders argued that minority jurors cluster at the end of the venire because they are likely to fill out questionnaires more slowly. He presented no proof of this at the hearing. His claim thus appears to rest on unadulterated racial stereotyping. Without proof, Sanders's assumption that minority jurors fill out jury questionnaires more slowly than the rest of the population simply deserves no credence.

**{¶ 37}** On appeal, Sanders drops this argument and suggests instead that the real problem was the practice of returning questionnaires to jurors for correction, thus moving those jurors to the end of the list. He contends that the commissioner thereby "decided who went to the back of the venire" and hints that the commissioner may have discriminated against black veniremen.

**{¶ 38}** However, this argument is inconsistent with the evidence and the trial court's findings. There was no showing that the jury commissioner manipulated the questionnaires so as to push black veniremen (or any others) to the end of the list. The jury coordinator testified that he and the commissioner returned questionnaires only to veniremen who had either failed to complete the forms or asked to have them returned so they could correct an answer. Hence, no "decisions" were being made by the jury officials. Rather, the ordering was decided by factors beyond their control. And the trial court evidently accepted this testimony, for it found that there had been no "systematic attempt on anybody's part * * * to keep any person off the jury."

**{¶ 39}** We therefore reject Sanders's claim that the system used by the jury commissioner precluded the possibility of securing a representative jury. His tenth proposition of law is overruled.

D. Demonstration Outside Courthouse

**{¶ 40}** During the trial, demonstrators opposing capital punishment picketed the courthouse. One juror reported to the bailiff that, during a lunch break, a demonstrator pointed him out and said, "There he goes" or "there goes one." The judge had two demonstrators brought in and warned them not to intimidate or speak to jurors.

**{¶ 41}** Defense counsel requested a chance "to ask [the jurors] some questions or [for] the court [to] ask them." The judge then questioned the jury.

**{¶ 42}** The judge told the jurors that he had warned the demonstrators not to speak to them, and that the demonstrators were "harmless people" with "absolutely no connection" to the parties. He asked: "Now does anybody feel, because of that incident, if you were involved in that incident, that you could not continue with this trial and be fair and honest with all the issues that you're going to be confronted with?" Nobody answered.

**{¶ 43}** He then asked the juror who had reported the incident whether he had any problem; he said he had none. The judge asked another juror, who said the same. Finally, he asked, "Does anybody have any problem?" Again, no juror spoke. The judge declared the subject closed, and trial proceeded.

**{¶ 44}** Sanders contends that this procedure was inadequate. In his twelfth proposition of law, he argues that this incident constituted an extraneous influence on the jury and that, under *Remmer v. United States* (1954), 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654, the court had a duty to conduct a deeper, more individualized inquiry. Sanders asks us to remand to the trial court for a *Remmer* hearing. See *United States v. Davis* (C.A.6, 1999), 177 F.3d 552, 557.

**{¶ 45}** The scope of voir dire is generally within the trial court's discretion, including voir dire conducted during trial to investigate jurors' reaction to outside influences. *State v. Henness* (1997), 79 Ohio St.3d 53, 65, 679 N.E.2d 686, 697. See, generally, Annotation (1992), 3 A.L.R.5th 963, Section 2(a). Thus, we must

determine whether the trial judge abused his discretion in conducting the inquiry as he did.

{¶ 46} In our view, he did not. Although the judge directly questioned only two jurors, he also asked: "Does anybody have any problem?" This was directed at all the jurors, and the judge could reasonably assume that those who did not speak up were unaffected. Hence, he did not abuse his discretion by stopping there. In *Henness*, we upheld a judge's refusal to question each juror individually as within the trial court's discretion. 79 Ohio St.3d at 65, 679 N.E.2d at 696-697. See, also, *United States v. Spinella* (C.A.5, 1975), 506 F.2d 426, 428-429.

{¶ 47} *United States v. Davis*, *supra*, cited by Sanders, is distinguishable. There, a juror in a drug trafficking trial was dismissed after informing the court that one of his employees had discussed his jury service with him; the juror felt intimidated after his employee told him that "members of the community * * * were discussing his role in the proceedings." *Id*., 177 F.3d at 556. Moreover, the juror admitted that he had discussed his fears with the other jurors. Yet the trial judge made no attempt *at all* to determine what effect the extraneous contact had upon the other jurors. Nor did he instruct the other jurors to disregard what the dismissed juror had told them. *Id.* at 556.

{¶ 48} Here, in contrast, the trial judge asked the jurors whether the incident with the demonstrators had affected them. Moreover, he acted to allay possible prejudice by warning the demonstrators not to speak to the jurors, by telling the jurors he had done so, and by informing the jurors that the demonstrators had no connection to either party in the case.

{¶ 49} Given the facts before the trial court, and the actions the court took, we find no abuse of discretion in its failure to go further still and interrogate each juror individually. Accordingly, we overrule Sanders's twelfth proposition of law.

E. Sleeping Juror

**{¶ 50}** The record indicates that one or more jurors may have fallen asleep during the trial. During a sidebar conference at trial, defense counsel alleged that Juror No. 3 appeared to have fallen asleep while the prosecution was playing tape-recorded phone conversations between inmate negotiators and DRC negotiators. Counsel asserted that the juror's eyes were shut for about an hour and fifteen minutes, and that the juror was motionless for half an hour. Counsel noted that the defense had "previously commented about this problem" (apparently off the record) during Kenneth Law's testimony. The judge said: "[O]bviously I've been watching her myself, and I'll make some determination what to do while we still have alternate jurors." Later that day, the judge told the jury he was keeping the courtroom temperature low "because there's too much sleeping going on. And I'm not going to tolerate it anymore. I know it's tedious, but you're going to have to all be alert."

**{¶ 51}** In his thirteenth proposition, Sanders contends that having a juror asleep during trial denied him due process, and that the trial judge should have replaced Juror No. 3. Alternatively, Sanders contends that the trial court should at least have examined the juror to determine whether she really was sleeping and what she missed.

**{¶ 52}** However, Sanders did not request either remedy at trial, nor did he express dissatisfaction with the trial judge's handling of the matter. See *United States v. Kimberlin* (C.A.7, 1986), 805 F.2d 210, 244; *United States v. Newman* (C.A.1, 1992), 982 F.2d 665, 670. Moreover, "[t]here is no *per se* rule requiring an inquiry in every instance of alleged [juror] misconduct." *United States v. Hernandez* (C.A.11, 1991), 921 F.2d 1569, 1577; see, also, *Newman*, 982 F.2d at 670. Thus, in the absence of plain error, this claim is waived. See, generally, *State v. Childs* (1968), 14 Ohio St.2d 56, 43 O.O.2d 119, 236 N.E.2d 545.

**{¶ 53}** We find no plain error. A trial court "has considerable discretion in deciding how to handle a sleeping juror." *United States v. Freitag* (C.A.7, 2000),

230 F.3d 1019, 1023; see, also, *United States v. Bradley* (C.A.3, 1999), 173 F.3d 225, 230.  There is no evidence that the juror missed large or critical portions of the trial.  See *Freitag*, *supra,* at 1023; *United States v. Barrett* (C.A.9, 1983), 703 F.2d 1076, 1083, fn. 13.  The taped conversations between inmate and DRC negotiators were not critical.  (The defense also alleged that a juror had fallen asleep during Law's testimony, but nothing in the record shows which juror allegedly slept or what part of Law's testimony that juror allegedly missed.)

{¶ 54} Moreover, the trial judge was watching the situation, and he admonished the jury to be alert.  Compare *United States v. McFerren* (Apr. 8, 1998), C.A.6 No. 96-5458, unpublished opinion, 1998 WL 180514 (affirming conviction where judge "kept a watchful eye on the jury" and, when necessary, admonished jurors to stay awake).

{¶ 55} For the foregoing reasons, we do not find plain error.  Sanders's claim is therefore waived, and we overrule his thirteenth proposition of law.

## II. Guilt Phase Issues

### A. Weight/Sufficiency of Evidence

{¶ 56} In his thirtieth proposition of law, Sanders contends that his conviction was against the manifest weight of the evidence.  See, generally, *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, 546-547.  Pursuant to R.C. 2953.02, we can overturn a conviction as being against the manifest weight of the evidence in a capital case, but only where the crime was committed after January 1, 1995.  See *State v. Smith* (1997), 80 Ohio St.3d 89, 102-103, 113, 684 N.E.2d 668, 683-684, 690-691.

{¶ 57} However, we can treat Sanders's manifest-weight claim as a challenge to the legal sufficiency of the evidence.  See *State v. Powell* (1990), 49 Ohio St.3d 255, 260, 552 N.E.2d 191, 197.  "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt." (Emphasis *sic*.) *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2788-2789, 61 L.Ed.2d 560, 573; *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

{¶ 58} The state's evidence showed that Sanders was the leader of the Muslim inmates at SOCF; that he planned and led the takeover; that, at a meeting of inmate leaders, Sanders supported killing a guard; that the leaders decided to do so; that Sanders ordered James Were to execute that decision; and that, as a result, Were and others killed Vallandingham.

{¶ 59} Inmates Stacey Gordon and Reginald Williams testified that, before the riot, Sanders approached them to discuss his plan to take over part of the prison. Four guards testified that at the outset of the riot, Sanders said he was "running this" or "in charge."

{¶ 60} During the takeover and siege, Sanders ordered certain inmates punished and others protected. There was abundant evidence that Muslim inmates obeyed Sanders even when he ordered them to kill. For instance, Sanders ordered Muslim inmates to kill inmate Johnny Fryman. Sanders and other inmates attacked Fryman, stabbed him, and left him for dead (although he lived to testify against Sanders).

{¶ 61} The Muslim inmates also obeyed Sanders when he ordered them *not* to kill, as when he saved the life of inmate Miles Hogan. When Sanders learned that certain inmates had been murdered without his authorization, he became upset and shouted: "Who ordered that?"

{¶ 62} Lomache, Lavelle, and Snodgrass testified that Sanders was at the April 14 meeting and agreed that a guard should be killed if demands were not met. Snodgrass quoted Sanders as saying: "Look, *this is our bargaining chips*[,] we got to keep him safe." (Emphasis added.)

{¶ 63} On the night before the murder, Hogan overheard inmates Skatzes and Cummings tell Sanders "about somebody that was supposed to kill a

correctional officer [and] had backed out of it." According to Hogan, Sanders complained that he was "sick" of people "saying they was going to do something and then back[ing] out of it at the last minute." Cummings said he "would make sure this got done," and Sanders replied: "Well somebody'd better do it."

{¶ 64} This evidence shows Sanders's complicity in Vallandingham's murder. It proved that he intended to kill Vallandingham and that he engaged in prior calculation and design. The evidence here is clearly sufficient to support the verdict. Sanders's thirtieth proposition is overruled.

B. Expert Assistance

{¶ 65} An indigent defendant has a due process right to hire expert assistance at state expense where he can make "a particularized showing (1) of a reasonable probability that the requested expert assistance would aid in his defense, and (2) that denial of the requested expert would result in an unfair trial." *State v. Mason* (1998), 82 Ohio St.3d 144, 694 N.E.2d 932, syllabus. Sanders's first proposition of law claims that he was improperly denied the assistance of experts on audiotape analysis and hypnosis.

{¶ 66} *Audiotape-analysis expert*. Having received copies of the "tunnel tapes" in discovery, Sanders sent one to Steve Cain, a forensic scientist, who set forth his findings in a document entitled "Preliminary Lab Report." Cain found "anomalies" in the tape: discontinuities in ongoing speech, abrupt ends to conversations, and changes in background noise. In Cain's opinion, these anomalies suggested that someone might have edited the original recording, but to determine whether editing had occurred, Cain needed to examine the original.

{¶ 67} Sanders filed a motion for expert assistance, with Cain's report attached, asking the court to appoint an expert in tape-recording analysis. The trial court denied the motion.

{¶ 68} At trial, FBI agent Mark A. Hopper testified that the persons monitoring the recorders would have turned them off when conversation stopped,

listened periodically for further conversation, and turned the recorders back on when they heard conversation. Hopper had helped to set up the equipment but did not observe the monitoring.

{¶ 69} The court of appeals held that expert assistance was unnecessary because the discontinuities in the conversations were explained by the fact that the recorders were turned on and off. However, Cain's report identified three instances where, in his opinion, a discontinuity was apparently *not* accompanied by a starting or stopping of the recorder.

{¶ 70} Nevertheless, we find no error in the trial court's denial of the motion. Although Cain's report did show a possibility that the tape was edited, Sanders did not show how the alleged edits could have affected his case. His motion did not explain how the allegedly edited version of Tunnel Tape 61 differed from the actual conversation or how it would tend to falsely implicate him in the offenses charged. Hence, he did not make a "particularized showing" that the requested expert could help his defense. *Mason*, 82 Ohio St.3d 144, 694 N.E.2d 932, syllabus.

{¶ 71} *Hypnosis expert*. Sanders filed a motion for the appointment of an expert on hypnotically refreshed testimony and a motion to prohibit such testimony. He attached statements from two such experts who had read a transcript of an investigator's interview with Correctional Officer Michael Hensley. One expert believed that Hensley had been hypnotized to refresh his memory. This expert based his conclusion on the fact that Hensley's psychologist had told him that looking at prisoners or mug shots might trigger his memory. The second thought it possible that Hensley had been hypnotized, leading to false memories.

{¶ 72} The trial court held a hearing on Sanders's motion. At the hearing, Hensley testified that he had not been hypnotized. Correctional Officer Darrold Clark also testified that he had not been hypnotized. Sanders theorized that Hensley and Clark might have been hypnotized without knowing it, but he submitted no

evidence that this had happened. The court found that Sanders had failed to show that the two guards had been hypnotized, and thus denied the motion for expert assistance.

**{¶ 73}** Since no evidence supported Sanders's theory that Hensley or Clark had been hypnotized, Sanders failed to show a reasonable probability that a hypnosis expert would aid his defense or that denial of an expert would result in an unfair trial. We find no error in the denial of the motion.

### C. Prejudicial Evidence

**{¶ 74}** In his eleventh proposition of law, part A(2)(3) of his fifth proposition, and part B of his seventeenth, Sanders contends that the state introduced irrelevant, unfairly prejudicial evidence against him.

**{¶ 75}** The state introduced a great deal of evidence of various assaults and murders committed by other inmates. In many cases, Sanders was not involved in these particular crimes. Sanders argues that this evidence was irrelevant.

**{¶ 76}** Inmate Roger Snodgrass admitted that he helped kill two inmates. Snodgrass's participation in the riot and vulnerability to criminal charges went to his credibility, and the state was entitled to "draw the sting" of cross-examination by bringing out facts discrediting Snodgrass on direct. See *State v. Tyler* (1990), 50 Ohio St.3d 24, 34, 553 N.E.2d 576, 590.

**{¶ 77}** Inmate Keith Lamar's murders of suspected informants in L-6 was also relevant. There was testimony that Sanders ordered certain inmates locked up for their own protection because he knew that Lamar was killing "snitches." This showed Sanders's power to make life-or-death decisions.

**{¶ 78}** Similarly, we find relevant the assault on inmate Andre Stockton. Muslim inmate Reginald Williams testified that when another Muslim assaulted Stockton, Williams made him stop because Sanders had *not* ordered it.

**{¶ 79}** The assaults on the prison guards during the takeover tell the story of the takeover, explaining how the prisoners came to be in control, and were a necessary piece of stage-setting.

**{¶ 80}** Moreover, evidence of the widespread assaults and killings that took place during the riot showed that a dangerous situation prevailed in L-Block. The existence of a dangerous situation, combined with the fact that Sanders was obeyed when he ordered that certain people not be harmed, showed how far his influence with the rioting prisoners extended; in fact, it showed that Sanders possessed power over life and death. That supports the state's claim that, by ordering Vallandingham killed, he *caused* Vallandingham to be killed. The numerous assaults on guards and inmates also tended to show that when Sanders issued orders to kill, he could assume that they would be carried out. That tends to show Sanders's murderous intent.

**{¶ 81}** Evidence of the terror experienced by the kidnapped guards indicates that the guards would be unlikely to forget what they had undergone, which goes to their credibility as witnesses.

**{¶ 82}** Since reasonable bases exist to hold that all the evidence at issue was relevant, the ultimate decision on relevance rested in the trial judge's broad discretion. Hence, its admission did not amount to plain error, since under Crim.R. 52(B) plain error must be "obvious" as well as outcome-determinative. See *State v. Keith* (1997), 79 Ohio St.3d 514, 518, 684 N.E.2d 47, 54. Because no plain error occurred, Sanders's failure to object at trial waived these claims.

**{¶ 83}** In his fourteenth proposition, Sanders claims that the state used an excessive number of gruesome photographs of the two murder victims, Vallandingham and Bruce Harris. Sanders did not object at trial, waiving this issue.

**{¶ 84}** Sanders contends that numerous crime-scene and autopsy photos of Bruce Harris were repetitive, showing the same things from slightly different angles or distances. However, these photos were not prejudicial, since the jury *acquitted*

18

Sanders of murdering Harris. Sanders further claims that the autopsy photos of Vallandingham are cumulative. But the photos in question were not so gruesome as to arouse prejudice.

{¶ 85} Admission of these photos does not reach the level of plain error. Thus, Sanders's failure to object at trial waives this issue.

{¶ 86} Sanders's eleventh and fourteenth propositions of law, parts (A)(2) and (3) of his fifth proposition of law, and part B of his seventeenth proposition of law are overruled.

### D. Exclusion of Defense Evidence

{¶ 87} Sanders's fifteenth proposition of law and parts C(4) and C(5) of his first proposition allege that defense evidence was wrongly excluded.

{¶ 88} During the siege, FBI agents tape-recorded conversations in L-Block with equipment placed in tunnels underneath the cellblock. At trial, these were referred to as "tunnel tapes." During Sanders's testimony, the defense attempted to introduce Tunnel Tape 61, which recorded an inmate meeting. The defense had originally attempted to play this tape during the cross-examination of inmate Roger Snodgrass, a state's witness. However, the tape was not played then because there was no machine available to play it. The defense contended that the state had altered the tape in such as way as to frame Sanders.

{¶ 89} The trial judge ruled that Sanders could play the tape but said that Sanders could not "comment" on the tape during his testimony. The judge then clarified his ruling: "If [Sanders] wants to testify that that's not his voice * * * or that's the voice of Gordon or that's the voice of someone else because he recognizes it, *I'll let him do that*." (Emphasis added.) However, the judge added, because Sanders was not an expert, he could not say that the tape was "faked."

{¶ 90} Sanders claims that the trial court "deprived the defense of an opportunity to play the tape and impeach the State's witnesses, who had previously testified about this meeting."

**{¶ 91}** However, the trial court did not prevent Sanders from playing the tape. Moreover, Sanders was free to identify voices and explain how the tape differed from the actual conversation.

**{¶ 92}** Furthermore, Sanders did not attempt to authenticate the tape by proffering "evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(A); see, also, Evid.R. 901(B)(1). Sanders did not show that the tape he wanted to play was either the original tape or the same copy of that tape that the state had given him in discovery. Thus, he laid no foundation from which the jury could find that the state was responsible for any alleged alterations of the recording.

**{¶ 93}** Sanders tried to introduce Tunnel Tape 60, which recorded another meeting in which David Lomache spoke vehemently in favor of the rioters' objectives. (Lomache admitted making this speech but claimed that he had been "acting.") The defense tried to use the tape as a prior inconsistent statement to impeach Lomache's testimony that he had not been in favor of the riot.

**{¶ 94}** The trial court excluded the tape. Sanders argues that the trial court, by refusing to let him play the tape, denied him the opportunity to subject the state's case to adversarial testing.

**{¶ 95}** However, although the tape itself was excluded, the defense was allowed to confront Lomache on cross-examination with a transcript of the tunnel tape. Indeed, defense counsel got Lomache to admit that he made a "pep rally" speech at the meeting and that he had feared that these statements might cause him to be prosecuted for his involvement in the riot. Since Lomache's testimony was subjected to adversarial testing, we reject Sanders's Sixth Amendment claim.

**{¶ 96}** At trial, the defense attempted to introduce a record of inmate attendance at religious services in SOCF. The defense proffered the attendance record to show that "two of the people they alleged are Muslims never attended Muslim services." The defense did not state which two inmates it was referring to.

The trial judge, finding the exhibit's relevance "tenuous," excluded it. Sanders claims that this was error.

{¶ 97} Sanders contends that the exhibit impeached the credibility of certain inmates by showing that they "lied about being Muslim." But since the defense never identified the inmates in question, we are unable to determine whether it had any impeachment value as to those inmates. In any event, because the exhibit covered only a limited period (December 1992-March 1993), it did not show that any given inmate *never* attended services.

{¶ 98} Trial courts have broad discretion in determining the relevance or irrelevance of evidence. See *State v. Hymore* (1967), 9 Ohio St.2d 122, 128, 38 O.O.2d 298, 302, 224 N.E.2d 126, 130. The trial judge here did not abuse his discretion by excluding the attendance record: his finding that it had "tenuous" relevance was reasonable under the circumstances.

{¶ 99} Sanders's fifteenth proposition of law is overruled.

### E. Assigning Blame for the Riot

{¶ 100} SOCF Deputy Warden David See testified for the state. On cross-examination, Sanders attempted to ask See about a series of TB tests performed on SOCF inmates in 1982 and 1983. The state objected. According to Sanders's proffer, See conducted the 1982-1983 tests in a "non-confrontational" manner, and See described that method to Tate a few days before the riot and "suggested that this would be a more peaceful means of resolving the matter." The trial judge ruled the proffered testimony irrelevant and sustained the objection. He also sustained the state's objection to Sanders's attempt to cross-examine Tate regarding prison conditions that may have contributed to the riot.

{¶ 101} At trial, the state introduced portions of tape-recorded phone conversations between inmates and DRC negotiators. The defense asked that other parts of these "negotiation tapes" be played to show that "the prison administration

did not take the inmates seriously and did not negotiate in good faith." The trial court denied the request.

{¶ 102} Sanders challenges these rulings by the trial court in his part C(4) of his first and in his sixteenth propositions of law. He argues essentially that, if the state was permitted to show that he was responsible for the riot, then the defense had a right to show that the prison administration also bore some responsibility for it.

{¶ 103} However, the guilt phase of the trial was not supposed to be a free-floating inquiry into who should bear the most blame for the riot. Its purpose was to determine whether Sanders was guilty of the murder of Vallandingham and the other crimes he was charged with. The relevance of either side's evidence must be evaluated with that in mind.

{¶ 104} Evidence that Sanders instigated and led the riot was not introduced for the purpose of showing that Sanders, as opposed to the prison administration, was "responsible" for the riot. Instead, it was introduced to show that he was an inmate leader whose orders were obeyed—a fact that was directly relevant to his culpability for Vallandingham's murder.

{¶ 105} On the other hand, evidence that the prison administration may have contributed to the tensions that led to the riot was utterly irrelevant to the guilt phase. It did not negate the evidence showing that Sanders organized and led the riot, nor did it negate the evidence showing that Sanders ordered the murder of Vallandingham. It may explain *why* Sanders did what he did, but it provides neither justification nor excuse for his acts.

{¶ 106} Nor was DRC's alleged refusal to "negotiate in good faith" relevant in the guilt phase. Let us be clear: The authorities in lawful charge of a prison have no duty to "negotiate in good faith" with inmates who have seized the prison and taken hostages, and the "failure" of those authorities to negotiate is not an available defense to inmates charged with the murder of a hostage.

**{¶ 107}** For these reasons, the trial court did not err in excluding the proffered evidence from the guilt phase of trial. Sanders's sixteenth proposition of law is overruled.

## F. Failure to Admonish Witnesses

**{¶ 108}** The trial judge ordered a separation of witnesses pursuant to Evid.R. 615 but refused a defense request that he admonish witnesses not to discuss their testimony with other witnesses. In his eighteenth proposition, Sanders claims that this refusal was error. However, the trial court has discretion to grant or deny such a request. See *State v. Richey* (1992), 64 Ohio St.3d 353, 364-365, 595 N.E.2d 915, 926. At trial, Sanders "failed to demonstrate any need for the measures he requested," *id.* at 365, 595 N.E.2d at 926; *Richey*, *supra*, and he now "fails to cite specific instances of preventable discussions, or any prejudice from the lack of such orders." *Id.* Sanders's eighteenth proposition is overruled.

## G. Discovery Issues

**{¶ 109}** At trial, Sanders asked for material from DRC files concerning certain inmate-witnesses. Inmates violating prison rules can be disciplined by a Rules Infraction Board ("RIB"); Sanders asked for any RIB hearing records involving the inmate-witnesses. The prosecution did not review the RIB files, taking the position that it had no duty to disclose those files to the defense because they were not in the possession of the prosecution. At trial, Sanders argued that either the state or the trial court had a duty at least to review the RIB files and determine whether they contained *Brady* material. In part C(3) of his first proposition of law, Sanders contends that the court's refusal to order the prosecutor to review the RIB records was error.

**{¶ 110}** Usually, "it is the state that decides which information must be disclosed," and that decision "is final." *Pennsylvania v. Ritchie* (1987), 480 U.S. 39, 59, 107 S.Ct. 989, 1002, 94 L.Ed.2d 40, 59. See, also, *State v. Patterson* (1971), 28 Ohio St.2d 181, 182, 57 O.O.2d 422, 423, 277 N.E.2d 201, 203. In this case,

however, the prosecution did not review the requested RIB files, claiming that the files were not in its possession. The state's citation of *State v. Lawson* (1992), 64 Ohio St.3d 336, 595 N.E.2d 902, to support its defense of lack of access is inapposite. In *Lawson*, the defendant sought disclosure of FBI records, which were outside the state's possession because they belonged to a separate sovereign, the United States. *Id.* at 344, 595 N.E.2d at 909. But the prosecutor and DRC are agents of the *same* sovereign, the state of Ohio.

{¶ 111} Prosecutors have "a duty to learn of any favorable evidence known to *the others acting on the government's behalf in the case*, including the police." (Emphasis added.) *Kyles v. Whitley* (1995), 514 U.S. 419, 437, 115 S.Ct. 1555, 1567, 131 L.Ed.2d 490, 508. The *Brady* obligation thus extends to information held by state or local agencies involved in the investigation or prosecution at issue. *United States v. Morris* (C.A.7, 1996), 80 F.3d 1151, 1169.

{¶ 112} Yet even so, in order to invoke a right to disclosure, or a concomitant prosecutorial duty to search records, a defendant must make a preliminary showing that the requested files actually contain material, exculpatory information. See *United States v. Brooks* (C.A.D.C.1992), 966 F.2d 1500, 1503-1504; *United States v. Santiago* (C.A.9, 1995), 46 F.3d 885, 894-895; *United States v. Burnside* (N.D.Ill.1993), 824 F.Supp. 1215, 1254. He "may not require the trial court to search through [a state agency's] file without first establishing a basis for his claim that it contains material evidence." *Pennsylvania v. Ritchie*, *supra*, 480 U.S. at 58, 107 S.Ct. at 1002, 94 L.Ed.2d at 58, fn. 15.

{¶ 113} Here Sanders's request was not supported by facts to indicate that any material exculpatory or impeaching information actually *was* in the specified records. The request itself did not identify any such information. Rather, Sanders made a broad request for *any* information related to "misconduct," "bad acts," or "antisocial acts" by any inmate who was to be a witness. We note that, assuming that such material existed, much of it would likely have been unusable as

24

impeachment. Specific instances of a witness's misconduct could not be proved by extrinsic evidence, and could be raised on cross-examination *only* if clearly probative of truthfulness or untruthfulness. Evid.R. 608(B).

{¶ 114} "[A] *specific* request will sometimes require the trial court to review the contested matter *in camera* to determine whether it is material or exculpatory despite representations to the contrary by the prosecutor." (Emphasis added.) *State v. Lawson*, 64 Ohio St.3d at 344, 595 N.E.2d at 909. But Sanders did not make a specific request, and he submitted no facts to the trial court that would indicate that impeachment material actually existed in the RIB files. We therefore conclude that neither the trial court nor the prosecutors were required to review the RIB files for *Brady* material.

{¶ 115} In his twenty-eighth proposition, Sanders contends that the trial court should have given him access to the grand jury testimony of inmates involved in the riot. Sanders failed to raise these issues in the court of appeals. He thereby waived them. Sanders's twenty-eighth proposition is overruled.

## H. Instructions

{¶ 116} Sanders's third, nineteenth, twentieth, twenty-first, and thirty-third propositions of law allege error in the guilt-phase instructions. However, all these claims were waived at trial by failure to object, and none of the alleged errors amounts to plain error.

{¶ 117} In his twenty-first proposition, Sanders contends that the trial judge erred in defining the R.C. 2929.04(A)(7) felony-murder specification to the count charging him with the felony-murder of Vallandingham under R.C. 2903.01(B). The judge did not instruct that, to find the felony-murder specification, the jury must determine whether the defendant committed aggravated murder while committing kidnapping *and* that he did so with prior calculation and design. Instead, Sanders argues, the court's instruction allowed the jury to find the specification based on the existence of prior calculation and design alone.

**{¶ 118}** It is true that the trial court mistakenly omitted the element of committing aggravated murder during kidnapping from its instruction on the felony-murder specification to the felony-murder count.[4]  However, the felony-murder count to which the specification was attached was predicated on the commission of murder during a kidnapping, and the jury was instructed that it must find Sanders guilty of kidnapping in order to find him guilty of aggravated murder on that felony-murder count.  Thus, the instruction on the specification *presupposed* that the jury had already found Sanders guilty of kidnapping, since without having so found, the jury could not have convicted him of the felony-murder count to which the specification was attached.

**{¶ 119}** Plain error exists only when it is clear that the verdict would have been otherwise but for the error.  *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804.  In this case, had the judge instructed correctly, the verdict would have been precisely the same, since the jury *did* find Sanders guilty of murder during kidnapping by returning a verdict of guilt on the felony-murder count (as well as the separate count alleging the kidnapping of Vallandingham).  Thus, the error was not plain error, and Sanders waived it by failing to object.

**{¶ 120}** Also in his twenty-first proposition, Sanders contends that the judge erred in defining the course-of-conduct specification.  If the record is correct, the judge did err by twice substituting the word "intent" for "attempt."

**{¶ 121}** However, we do not find plain error.  The verdict forms correctly stated the elements of the specification.  Counsel for both parties correctly stated its elements in argument.  Finally, the evidence supports a finding of the specification.  Thus, it is not clear that the outcome of the guilt phase would have

---

4.  We note that the judge did include the element of committing aggravated murder during kidnapping when he defined the felony-murder specification attached to the *other* Vallandingham aggravated-murder count.

been otherwise—*i.e.*, that the jury would have failed to find Sanders guilty of the specification—had it not been for the error. There is no plain error.

{¶ 122} Sanders claims two other instructional errors in his twenty-first proposition. First, he contends that the trial court's instructions allowed the jury to infer the existence of prior calculation and design upon finding purpose to kill. However, the trial judge explained that prior calculation and design "means that the purpose to kill * * * was reached by a complete process of reasoning in advance of the actual killing, * * * including a studied consideration of the method and means with which to kill." This was a clear, correct explanation of the concept of prior calculation and design.

{¶ 123} Sanders further contends that the judge confused the jury by "equating" prior calculation and design with premeditation.[5] Sanders contends that the term "premeditation," as Ohio courts defined it before 1974, includes momentary or instantaneous deliberation.[6] Therefore, Sanders claims, the jury could have found prior calculation and design under this instruction even if it believed that Sanders had killed on the spur of the moment.

{¶ 124} However, the trial court specifically instructed that "acting on the spur of the moment or after momentary consideration of the purpose to kill is *not* enough to amount to the kind of prior calculation and design necessary for this kind of aggravated murder." (Emphasis added.)

{¶ 125} Moreover, it is unlikely that the judge's use of the word "premeditation" caused the jury to ignore or misapply this correct instruction. The judge never told the jury that "premeditation" includes instantaneous deliberation,

---

5. The judge stated: "You may have heard on mystery stories or something somewhere else about premeditated murder. Well, this is prior calculation and design. Whether it is premeditated murder, I don't know. But I am going to tell you what we understand under the law prior calculation and design is."

6. *State v. Taylor* (1997), 78 Ohio St.3d 15, 18-19, 676 N.E.2d 82, 88.

and we see no reason to suppose that the jury was familiar with the history of the term "premeditation" as construed in Ohio courts before 1974. Finally, the evidence did not suggest in any way that Sanders decided to order Vallandingham's death on the spur of the moment.

{¶ 126} For these reasons, it is not clear that the jury's verdict would have been otherwise but for the alleged error. Sanders's claim is therefore not plain error under *Long*.

{¶ 127} In his third proposition of law, Sanders alleges that the trial court gave a deficient instruction on complicity. He argues that the court failed to make clear that complicity in an offense requires the specific mental state required for that offense. Thus, he contends, the instruction may have allowed the jury to find him guilty of complicity, and therefore of aggravated murder, without finding that he specifically intended to kill Vallandingham.

{¶ 128} However, instructions must be read as a whole. *State v. Price* (1979), 60 Ohio St.2d 136, 141, 14 O.O.3d 379, 382, 398 N.E.2d 772, 775. The trial judge made several strong statements that Sanders could be convicted of aggravated murder only if the state proved that he harbored the specific purpose to kill Vallandingham. He also explained how the jury could determine whether purpose existed, thus underlining that purpose was necessary to a conviction.

{¶ 129} We find that the possibility of jury confusion with respect to this issue does not reach the level of plain error. Sanders's third proposition is waived.

{¶ 130} In his nineteenth proposition, Sanders claims that the robbery instruction equated robbery with stealing. However, the complete instruction states *all* the elements of robbery, including the use or threat of force.

{¶ 131} He further argues that the judge in effect directed a verdict on the "deadly weapon" element of felonious assault and the "property" element of theft by instructing that a PR-24 (a police baton or nightstick) is a deadly weapon and that keys are property. However, it is far from clear that a differently instructed

jury would have acquitted Sanders of these crimes, and no plain error exists here. *Long*, 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804.

{¶ 132} In his twentieth proposition, Sanders contends that the kidnapping instruction was flawed because the trial court instructed the jury with respect to the "released unharmed in a safe place" language of R.C. 2905.01(C).

{¶ 133} If a kidnapper releases his victim unharmed in a safe place, that fact reduces the offense of kidnapping from a first-degree to a second-degree felony. R.C. 2905.01(C). It is not an element of the offense; rather, the accused must plead and prove it in the fashion of an affirmative defense. See *State v. Cornute* (1979), 64 Ohio App.2d 199, 18 O.O.3d 152, 412 N.E.2d 416, syllabus. As Sanders points out, since he did not claim that Vallandingham was released unharmed in a safe place, that was not properly an issue.

{¶ 134} Sanders argues that the instruction prejudiced him because an affirmative defense concedes the act constituting the crime. However, this argument fails, since the jury was never told that Sanders had conceded committing the act.

{¶ 135} Sanders further argues that the "released in a safe place unharmed" language was prejudicial because, by emphasizing that Vallandingham was killed, it "effectively created an improper aggravating circumstance." But Sanders's claim that the jury may have treated Vallandingham's death as an aggravating circumstance rests wholly upon speculation. Thus, it is not clear that the outcome would have been otherwise but for the error, and we therefore cannot find plain error. Sanders's twentieth proposition is waived, and we therefore overrule it.

{¶ 136} Finally, Sanders's thirty-third proposition, which claims that the statutory reasonable-doubt instruction is unconstitutional, is waived. We find no plain error. See *State v. Van Gundy* (1992), 64 Ohio St.3d 230, 594 N.E.2d 604.

{¶ 137} Since none of the claimed instructional errors amounts to plain error, Sanders's claims are waived by his failure to object at trial. Consequently,

his third, nineteenth, twentieth, twenty-first, and thirty-third propositions of law are overruled.

## I. Jury View

**{¶ 138}** Sanders requested that the jury be brought to SOCF to view the scene of the riot. The state argued that the premises had changed so much since then that a jury view would not be helpful. The trial court agreed and denied the motion.

**{¶ 139}** A trial court has broad discretion in such matters. *State v. Zuern* (1987), 32 Ohio St.3d 56, 58, 512 N.E.2d 585, 588. In part C(2) of his first proposition, Sanders argues that the trial judge here abused that discretion, but we disagree. The decision had a rational basis.

**{¶ 140}** Sanders further contends that denial of a view denied him a meaningful opportunity to present a complete defense. We disagree. Denial of a view did not "significantly [undermine] fundamental elements of the defendant's defense." *United States v. Scheffer* (1998), 523 U.S. 303, 315, 118 S.Ct. 1261, 1267-1268, 140 L.Ed.2d 413, 422.

## III. Penalty Phase Issues

## A. Exclusion of Mitigation

**{¶ 141}** In his second proposition of law, and in part D of his first proposition, Sanders argues that the trial court should have permitted him to introduce penalty-phase testimony on pre-riot "conditions" at SOCF to show the mental and emotional stress inflicted on inmates.

**{¶ 142}** In the penalty phase, Sanders called Joseph R. Rowan, a correctional and criminal justice consultant. Rowan had been an expert witness in lawsuits concerning SOCF and had studied reports and depositions about the riot. Sanders asked him what problems existed at SOCF before the riot. The state objected.

{¶ 143} In response, the defense made a proffer of Rowan's testimony. Rowan stated that "psychological brutality" at SOCF, the fruit of poor administration, caused the riot. He stated that the warden could have prevented the riot with a different approach to the issue of TB testing. Finally, Rowan said that a public statement by a DRC employee, which angered the inmates, was "the major triggering factor" in Vallandingham's murder.

{¶ 144} The defense argued that the riot's causes were relevant in mitigation because the state claimed that Sanders had started the riot. The defense wished to contradict that by showing that the inmates had intended *not* to riot but to stage "a short-lived demonstration in L-6," which "got out of control." The defense offered to show that prison conditions made SOCF "ripe for disturbance" that, once started, would inevitably become "uncontrollable." However, the trial court excluded Rowan's testimony, holding that the causes of the riot were "irrelevant" and "not a mitigating factor."

{¶ 145} In our view, the trial court erred: Rowan's testimony was relevant mitigation. The Eighth Amendment allows a capital defendant to introduce "any aspect of [his] character or record and *any of the circumstances of the offense* that the defendant proffers as a basis for a sentence less than death." (Emphasis added.) *Lockett v. Ohio* (1978), 438 U.S. 586, 604, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973, 990. See, also, *State v. McGuire* (1997), 80 Ohio St.3d 390, 403, 686 N.E.2d 1112, 1122-1123. R.C. 2929.04(B) also requires the sentencer to consider "the nature and circumstances of the offense."

{¶ 146} Since Vallandingham's murder was a direct result of the riot, we think that the riot and its causes are "circumstances of the offense" and therefore relevant to mitigation. Hence, Sanders had a right to show in the penalty phase why the prisoners rioted. Additionally, the fact that Sanders may have acted in anger caused by the DRC employee's statement is relevant mitigation.

**{¶ 147}** It is true, as we explain *supra*, that the causes and motivations of the riot do not justify or excuse the riot, much less the murders committed during the riot. Thus, the trial court quite properly excluded it from the *guilt* phase. But a court may not exclude relevant mitigation, as a matter of law, from the *penalty* phase on the ground that the asserted mitigating factor fails to justify or excuse the crime. *Eddings v. Oklahoma* (1982), 455 U.S. 104, 113-114, 102 S.Ct. 869, 876-877, 71 L.Ed.2d 1, 10-11.

**{¶ 148}** This error does not require a new sentencing hearing, however. We have held that, when independently reviewing a death sentence pursuant to R.C. 2929.05(A), we may "consider proffered evidence that the jury was erroneously not allowed to consider." *State v. Williams* (1996), 74 Ohio St.3d 569, 578, 660 N.E.2d 724, 733. Thus, we can cure the trial court's error by considering Rowan's proffered testimony in our independent review, *infra*.

B. Guilt-Phase Evidence in Penalty Phase

{¶ 149} Sanders contends that the trial court should not have permitted the reintroduction of all guilt-phase evidence in the penalty phase. See *State v. Getsy* (1998), 84 Ohio St.3d 180, 201, 702 N.E.2d 866, 887; but, compare, *State v. Woodard* (1993), 68 Ohio St.3d 70, 78, 623 N.E.2d 75, 81; and see, generally, R.C. 2929.03(D)(2). However, Sanders did not object, so this issue is waived.

C. Opinions of Victim's Family

{¶ 150} In part C of his seventeenth proposition, Sanders complains that Vallandingham's mother was allowed to address the judge at the final sentencing hearing and request a death sentence. Permitting the statement was improper. See, *e.g.*, *State v. Huertas* (1990), 51 Ohio St.3d 22, 27, 553 N.E.2d 1058, 1065. However, since only the judge heard the request—the jury having rendered its sentencing recommendation and been dismissed—and since a trial judge is presumed to have considered only the competent and material evidence, the impropriety does not reach the level of plain error. See *State v. Post* (1987), 32 Ohio St.3d 380, 384, 513 N.E.2d 754, 759.

D. Penalty-Phase Instructions

{¶ 151} In *State v. Brooks* (1996), 75 Ohio St.3d 148, 661 N.E.2d 1030, we held that a jury need not unanimously reject the death penalty before it may consider a life sentence. Instead, "the jury, when it cannot unanimously agree on a death sentence, [is required] to move on in their deliberations to a consideration of which life sentence is appropriate, with that determination to be unanimous." *Id.* at 162, 661 N.E.2d at 1042.

{¶ 152} In his fourth proposition of law, Sanders contends that the trial court gave a penalty-phase instruction that was inconsistent with *Brooks*. The court instructed: "[I]t is necessary that all twelve of you agree on any verdict that you return. You cannot have a decision in this second hearing if it's seven to five * * * or eleven to one. Whichever punishment you select must be twelve to zero."

However, the trial court did not specifically instruct that a solitary juror may block a recommendation of death. See *id.*, 75 Ohio St.3d at 162, 661 N.E.2d at 1042; but, compare, *Jones v. United States* (1999), 527 U.S. 373, 381-384, 119 S.Ct. 2090, 2098-2100, 144 L.Ed.2d 370, 381-384 (federal Constitution does not require court to instruct jury of the consequences of its inability to agree unanimously on a sentencing recommendation). However, he did not object to that instruction at trial. The alleged error was thus waived, and we therefore decline to consider it.

{¶ 153} In his twenty-fifth proposition, Sanders alleges three errors in the penalty-phase instructions. None of these issues was raised at trial, and so they are waived. None of the alleged errors amounts to plain error.

{¶ 154} Sanders argues that the trial court incorrectly instructed the jury that mitigating factors "may be considered * * * as lessening or reducing the degree of * * * blame or punishment." However, this was not plain error: The jury instructions, "taken as a whole, indicate that the penalty phase * * * was for a determination of punishment—not for the assessment of 'blame' or culpability." *State v. Woodard*, *supra*, 68 Ohio St.3d at 77, 623 N.E.2d at 80.

{¶ 155} The trial court also failed to specifically instruct the jury to consider the defendant's history, character, and background. However, the judge did instruct the jury to consider "*any* other factors that are relevant to the issue of whether or not the defendant should be sentenced to death." It is likely that the jury considered Sanders's history, character, and background under this catchall category, especially since defense counsel argued that Sanders's childhood "cries out for mercy." Thus, the omission of a specific history, character, and background instruction was not clearly outcome-determinative. Hence, it was not plain error under *Long*, 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804.

{¶ 156} Finally, the trial court did not tell the jury that it need not make unanimous findings as to the existence of mitigating factors. See *Mills v. Maryland* (1988), 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (jury may not be instructed

that it must unanimously agree on a mitigating factor before that factor may be weighed against aggravating circumstance); *McKoy v. North Carolina* (1990), 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (same). However, Sanders cites no language that "could reasonably be taken to require unanimity as to the presence of a mitigating factor." *Coe v. Bell* (C.A.6, 1998), 161 F.3d 320, 338. Without such language, *Mills* is not violated. *Id.* See, also, *Scott v. Mitchell* (C.A.6, 2000), 209 F.3d 854, 875-876. Thus, we do not find plain error as to this issue.

{¶ 157} In his twenty-sixth proposition, Sanders complains that the trial court instructed the jury that "[i]f the facts and the law warrant a recommendation for the death penalty, then it is your duty to make that finding uninfluenced by your power to recommend a lesser penalty." Sanders argues that this instruction was erroneous because it can never be the jury's duty to recommend death. Since he did not raise that objection at trial, the issue is waived absent plain error.

{¶ 158} However, R.C. 2929.03(D)(2) provides that, if the jury finds, unanimously and beyond a reasonable doubt, that the aggravating circumstances outweigh the mitigating factors, the jury "*shall* recommend * * * that the sentence of death be imposed." (Emphasis added.) See *State v. Allen* (1995), 73 Ohio St.3d 626, 638-639, 653 N.E.2d 675, 687. Hence, we cannot find that the trial court committed plain error as to this issue.

{¶ 159} Sanders's fourth, twenty-fifth, and twenty-sixth propositions of law are waived, and are therefore overruled.

## E. Sentencing Opinion

{¶ 160} In his twenty-seventh proposition of law, Sanders argues that the trial court's sentencing opinion improperly considered his leadership of the Muslims during the riot as a nonstatutory aggravating circumstance.

{¶ 161} After a brief summary of the verdicts and facts, the opinion contains a heading: "The Aggravating Circumstances." The first sentence under that

heading begins, "The Aggravating Circumstances were:" and the opinion then correctly states, in list form, the three specific circumstances found by the jury.

{¶ 162} Next comes a paragraph about Sanders and his behavior in the riot; it is here that the opinion mentions that Sanders was leader of the Muslims. Then, under a new heading, "The Mitigating Factors," the possible mitigating factors are set forth; then the opinion explains why the aggravating circumstances outweigh the mitigating factors.

{¶ 163} The opinion's structure suggests that only the specific, numbered factors listed immediately after the "Aggravating Circumstances" heading were the "aggravating circumstances" referred to in the heading. The facts recounted in the subsequent paragraph were not part of that list. We conclude that the trial court did not mistake those facts for aggravating circumstances.

{¶ 164} Sanders also claims that the trial court failed to consider his history, character, and background as mitigating. But the court's failure to specifically mention history, character, and background does not indicate that it failed to consider that factor.

{¶ 165} Sanders's twenty-seventh proposition of law is overruled.

F. Settled Issues

{¶ 166} We summarily overrule Sanders's twenty-fourth proposition on authority of *State v. Durr* (1991), 58 Ohio St.3d 86, 93, 568 N.E.2d 674, 682. See, also, *Mapes v. Coyle* (C.A.6, 1999), 171 F.3d 408, 414-415. We summarily overrule his thirty-fourth proposition. See, *e.g.*, *State v. Mills* (1992), 62 Ohio St.3d 357, 371-372, 582 N.E.2d 972, 985-986.

## IV. Prosecutorial Misconduct

{¶ 167} Sanders's fifth proposition claims that his convictions and death sentence should be reversed for prosecutorial misconduct in both phases of the trial.

### A. Guilt Phase

{¶ 168} In parts A(5) and A(6) of his fifth proposition, Sanders contends that the state made improper jury arguments.

{¶ 169} In the state's guilt-phase rebuttal argument, the prosecutor accused defense counsel of telling the jury "an absolute flat-out lie." The defense objected. The judge thereupon instructed the jury to disregard the prosecutor's statement. He expressly pointed out that the prosecutor's statement was improper and irrelevant, and that "there's nothing to indicate that [defense counsel was] a liar." He emphatically added that counsel's statements were not evidence.

{¶ 170} In part A(6)(1) of his fifth proposition, Sanders contends that it was misconduct for the prosecutor to accuse defense counsel of lying. He is correct. See *State v. Keenan* (1993), 66 Ohio St.3d 402, 405-406, 613 N.E.2d 203, 206-207 (prosecutor may not impute insincerity to opposing counsel). But this remark was followed by a strong curative instruction. Hence, the misconduct did not deny a fair trial. See *State v. Hawkins* (1993), 66 Ohio St.3d 339, 348, 612 N.E.2d 1227, 1234.

{¶ 171} In part A(6)(4) of his fifth proposition, Sanders accuses the prosecutor of denigrating defense counsel for making objections. "It is improper to denigrate defense counsel in the jury's presence for making objections." *Keenan*, *supra*, 66 Ohio St.3d at 406, 613 N.E.2d at 207. However, the prosecutor did not do that. He did complain to the judge that "I've only got a limited amount of time. Every time he objects I lose time." But this was not an attack on opposing counsel for objecting; it was an appeal to the court for more time to argue.

{¶ 172} The remainder of part A(6) is waived, as is the whole of part A(5), because Sanders did not object at trial to the misconduct alleged therein.

{¶ 173} In part A(3) of his fifth proposition, Sanders accuses the state of presenting perjured testimony. The state may neither suborn perjury, *Mooney v. Holohan* (1935), 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791, nor introduce testimony it knows or should know is false without correcting it. *Napue v. Illinois* (1959), 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217.

{¶ 174} Sanders argues that Kenneth Law's testimony was "unreliable." Law had been indicted with death specifications as a principal offender in Vallandingham's aggravated murder. The jury in Law's case failed to reach a verdict on the aggravated murder charge but convicted him of kidnapping Vallandingham. Law then entered into a plea agreement with the state: he pled guilty to conspiracy to commit murder and agreed to testify against three co-defendants, and the state dismissed the death specifications.

{¶ 175} At Sanders's trial, Law testified that he did not participate in Vallandingham's murder but watched while two other inmates killed Vallandingham. Sanders argues that, because the state had originally indicted Law as a principal offender in the aggravated murder of Vallandingham, and because Law's testimony was inconsistent with Law's being a principal offender, we should conclude that Law's testimony was false and that the state knowingly presented false testimony.

{¶ 176} Sanders's claim is untenable. There is nothing in the record to show that Law's testimony was false. Law's previous indictment on aggravated murder charges is not enough to justify Sanders's accusation of perjury; an indictment, which is "a mere accusation," *State ex rel. Lipschutz v. Shoemaker* (1990), 49 Ohio St.3d 88, 90, 551 N.E.2d 160, 162, may issue upon probable cause alone. See, *e.g.*, *State v. Van Meter* (1998), 130 Ohio App.3d 592, 601, 720 N.E.2d 934, 940; *State v. Hayes* (1994), 99 Ohio App.3d 530, 533, 651 N.E.2d 62, 64. In any event, the jury in this case knew that Law had been indicted as a principal offender in the murder and could assess his credibility in light of that knowledge.

Hence, there was no due process violation. See *Overton v. United States* (C.A.5, 1971), 450 F.2d 919, 920; *Tapia v. Tansy* (C.A.10, 1991), 926 F.2d 1554, 1563.

{¶ 177} In part A(1) of his fifth proposition, Sanders contends that the prosecution made improper comments during opening statement. Sanders did not object to the alleged misconduct at trial. Hence, the issues raised here are waived. The issues raised in part A(4), alleging that the state improperly cross-examined Sanders, are also waived for the same reason.

{¶ 178} In part A(2)(2) of his fifth proposition, Sanders contends that the prosecution improperly led its own witnesses on direct examination. It was within the trial court's discretion to permit leading questions on direct, however, and Sanders does not make a persuasive case that the court abused that discretion.

{¶ 179} Parts A(2)(1) and A(2)(2) of Sanders's fifth proposition were not preserved at trial. Part A(2)(3) is discussed, and overruled, in conjunction with Sanders's eleventh proposition, *supra*.

### B. Penalty Phase

{¶ 180} Sanders's assertions of guilt-phase prosecutorial misconduct were waived at trial, and none of them amounts to plain error.

{¶ 181} *Proposition 5(B)(1)(1)*: In the penalty phase, Sanders contends, the prosecutor referred to "nonstatutory aggravating circumstances" by mentioning the riot and the fact that it occurred during Easter week. However, the prosecutor did not say that these were aggravating circumstances, nor did he urge the jury to weigh them as aggravating circumstances.

{¶ 182} *Proposition 5(B)(1)(2)*: The prosecutor predicted that Sanders's mitigating evidence would not "move that scale one inch from what he's already done." Sanders finds in this statement the implication that the defense needed to present mitigation that outweighed the aggravating circumstances. His reading of this statement is extremely strained. A more natural reading is that Sanders's

mitigation was entitled to no weight at all, a claim that implies nothing about the burden of persuasion.

{¶ 183} *Proposition 5(B)(2)*: Sanders complains that the state asked inmate-witness Thomas Hurst about the murder of inmate Pop Svette. However, the brief iteration of this murder, without any details, was not highly prejudicial, since the jury had already heard extensive evidence in the guilt phase about several murders. It was not outcome-determinative plain error.

{¶ 184} *Proposition 5(C)(1) and 5(C)(2)*: In penalty-phase closing argument, the prosecutor asked the jury to "imagine" Vallandingham's feelings, and his "terror" and "desperation." This was improper, see *State v. Combs* (1991), 62 Ohio St.3d 278, 283, 581 N.E.2d 1071, 1077, but counsel did not object, and it was not plain error.

{¶ 185} The prosecutor's comparison between Sanders and his sister, who was a "law-abiding, hard-working, upstanding member of her community" despite a similar background and upbringing, was not plain error. See, *e.g.*, *State v. Murphy* (1992), 65 Ohio St.3d 554, 572, 605 N.E.2d 884, 900.

{¶ 186} Sanders's fifth proposition of law is overruled.

## V. Right-to-Counsel Issues

{¶ 187} In his sixth proposition of law, Sanders contends that he received ineffective assistance of counsel in both the guilt and penalty phases. Sanders's first, seventh, and twenty-ninth propositions also implicate the effectiveness of his counsel.

{¶ 188} Ineffective-assistance claims are governed by a two-prong test first articulated in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. First, the appellant must show that counsel's performance "fell below an objective standard of reasonableness," *id.* at 688, 104 S.Ct. at 2064, 80 L.Ed.2d at 693, and "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687, 104 S.Ct. at 2064,

80 L.Ed.2d at 693. A reviewing court must strongly presume that "counsel's conduct falls within the wide range of reasonable professional assistance," and must "eliminate the distorting effects of hindsight, * * * and * * * evaluate [counsel's] conduct from counsel's perspective at the time." *Id.* at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694.

{¶ 189} Second, the appellant must demonstrate prejudice—*i.e.*, "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698.

## A. Guilt Phase

{¶ 190} *Proposition 6(A)(1)*: Sanders's two trial attorneys sometimes disagreed with each other's judgments in open court, occasionally going so far as to countermand each other's decisions. Sanders argues that these disagreements rendered his attorneys ineffective. Nevertheless, Sanders must show specific errors by counsel that undermine confidence in the reliability of the verdict. *Strickland*, *supra*.

{¶ 191} During voir dire, lead counsel questioned a prospective juror regarding her death-penalty views, then challenged her for cause; however, the trial court denied the challenge. Two days later, the court recalled this juror for further questions. Lead counsel, believing he had already established cause, declined to question further. Co-counsel, however, did question the juror. After he was finished, the trial court excused the juror for cause.

{¶ 192} Sanders contends that co-counsel erred by getting this biased juror excused because otherwise Sanders would have had a reversible error to raise on appeal. However, Sanders's co-counsel had no professional obligation to create

41

error before the trial court. It was perfectly proper for co-counsel to dissuade the court from committing error prejudicial to his client.

{¶ 193} Another prospective juror, who opposed capital punishment, was excused due to high blood pressure. Co-counsel agreed that this juror should be excused and offered to waive any objection. However, lead counsel disagreed and placed an objection on the record. Sanders contends that co-counsel erred by acquiescing in excusal and thereby waiving the issue.

{¶ 194} Assuming that co-counsel's acquiescence was enough to effect waiver in the face of lead counsel's objection, it was not ineffective to acquiesce in the juror's removal. Because the erroneous excusal of a prospective juror on grounds unrelated to her views on the death penalty is not cognizable error (see discussion of eleventh proposition, *supra*), the waiver did not harm Sanders's position on appeal. Moreover, the asserted cause for excusal—the juror's health— was clearly legitimate. Finally, the excusal did not compromise the impartiality of the jury that actually sat on this case, and Sanders's assumption that this juror would have been favorable to the defense is pure speculation.

{¶ 195} During trial, co-counsel filed a motion to strike Kenneth Law's testimony, even though lead counsel had instructed co-counsel not to. Lead counsel then withdrew the motion. Sanders does not state whether filing the motion or withdrawing it was the unprofessional error contemplated by *Strickland*, nor does he explain what prejudice he suffered from either action.

{¶ 196} Sanders also claims in his sixth proposition that he received ineffective assistance due to specific errors by his trial counsel.

{¶ 197} *Proposition 6(B)(1)(1) and 6(B)(1)(2)*: Sanders takes issue with counsel's failure to inquire into racial and religious attitudes at voir dire, since Sanders is black and a Muslim charged with murdering a white. But trial counsel, who saw and heard the jurors, were in the best position to determine whether such voir dire was needed. *State v. Bradley*, 42 Ohio St.3d at 143, 538 N.E.2d at 381.

{¶ 198} *Proposition 6(B)(2)*: A defense attempt to subpoena FBI originals of tunnel tapes was quashed due to counsel's failure to follow correct procedures. Sanders, however, does not show how this lapse was prejudicial.

{¶ 199} *Proposition 6(B)(3) and (B)(4)*: Sanders's counsel filed pretrial motions challenging the jury selection process and claiming bias in the grand jury. At hearings on these motions, counsel presented witnesses but were unable to prove key factual claims. Sanders contends that this was due to inadequate preparation. It is equally likely, however, that the defense claims were incorrect. There is no way to tell from the record, so the ineffective assistance claim fails.

{¶ 200} *Proposition 6(C)(1)*: Sanders claims that trial counsel "conceded guilt" by suggesting that Sanders would be in prison "when this case is over." But since Sanders was *already* a prisoner, and would remain one regardless of the trial outcome, this statement did not concede guilt.

{¶ 201} *Proposition 6(C)(2), (C)(3), and (C)(4)*: Sanders takes issue with counsel's failure to ask witnesses whether they had talked to other witnesses, to object to certain evidence and arguments, to seek dismissal of a juror who allegedly fell asleep, and to request a hearing on how courthouse picketing may have influenced the jury.

{¶ 202} As to the juror, Sanders's counsel did bring the matter to the trial court's attention. As to the picketing, the trial court held a sufficient hearing. The other issues involved tactical judgments, and Sanders does not establish either attorney error or prejudice.

{¶ 203} *Proposition 6(E)*: Sanders claims that his counsel should have objected to allegedly erroneous instructions. But his claims were not supported by existing law at the time of the trial, and counsel had no duty to press "untested or rejected legal theories." *State v. McNeill* (1998), 83 Ohio St.3d 438, 449, 700 N.E.2d 596, 607.

B. Penalty Phase

{¶ 204} *Proposition 6(D)*: Sanders claims that counsel failed to adequately investigate mitigation. But the record does not indicate the extent of counsel's investigation. See *State v. Hutton* (1990), 53 Ohio St.3d 36, 48-49, 559 N.E.2d 432, 446. The defense actually presented significant mitigation. Since the record does not show whether further investigation could have developed anything more, Sanders can show neither attorney error nor prejudice.

{¶ 205} Finally, Sanders contends that counsel should have objected to the *en bloc* readmission of guilt-phase evidence in the penalty phase. We find no prejudice; there is not a reasonable likelihood that the jury would have returned a different recommendation but for the readmission of allegedly prejudicial evidence. Moreover, we find that counsel's failure to object did not fall below an objective standard of reasonable representation in light of then-existing law. See *State v. Woodard* (1993), 68 Ohio St.3d 70, 78, 623 N.E.2d 75, 81.

## C. Appeal

{¶ 206} In his twenty-ninth proposition, Sanders claims that he received ineffective assistance on appeal. He lists twenty-two issues that his counsel failed to advance in the court of appeals. However, raising every possible error is not required for effective appellate assistance. *Jones v. Barnes* (1983), 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987. None of Sanders's new claims is so strong that competent counsel would have felt compelled to raise it; indeed, they are not notably stronger than the issues appellate counsel did raise. Hence, Sanders's twenty-ninth proposition is overruled.

## D. Compensation

{¶ 207} In part B(1) of his first proposition of law, Sanders complains that his counsel were inadequately compensated and that this violated his right to counsel. However, Sanders still must show that he received ineffective assistance under the performance-and-prejudice standard established in *Strickland*, 466 U.S.

668, 104 S.Ct. 2052, 80 L.Ed.2d 674. This issue is not an independent ground for an ineffective-assistance claim.

### E. Interference with Counsel

{¶ 208} Sanders's trial attorneys were from Cincinnati. In early 1995, DRC transferred Sanders from the Warren Correctional Institution at Lebanon, near Cincinnati, to the Mansfield Correctional Institution. This move increased the distance the lawyers had to travel to see Sanders. Defense counsel estimated that it took two and one-half hours to drive one way between Cincinnati and Mansfield; thus, each lawyer had to invest a minimum of five hours per visit.

{¶ 209} In his seventh proposition, and part B(2) of his first, Sanders appears to contend that the state denied him effective assistance of counsel by incarcerating him so far from his lawyers. However, Sanders was returned to Lebanon about a month before the trial began and was housed in the Hamilton County Jail during trial. Moreover, Sanders appears to concede that his attorneys actually did visit him at Mansfield, despite the extra distance. See *State v. Coleman* (1999), 85 Ohio St.3d 129, 143-144, 707 N.E.2d 476, 489-490.

{¶ 210} Sanders invokes *Geders v. United States* (1976), 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592, which held that the trial court denied the defendant effective assistance when it forbade him to speak to his attorney during a seventeen-hour overnight recess, at a point in the trial when the defendant was on the stand. However, the judge in *Geders* totally "cut off communication" between lawyer and client "about anything" during the recess. *Id.* at 91, 96 S.Ct. at 1336 and 1337, 47 L.Ed.2d at 600 and 601. In contrast, the state here did not completely cut off attorney-client communication. Sanders's counsel did in fact visit him at Mansfield.

{¶ 211} Sanders also complains—in his seventh proposition, part C(1) of his first, and part A(2) of his sixth—that his counsel had insufficient time to prepare for trial. Lead counsel was appointed nearly two months before trial to replace

Sanders's previous lead counsel, who had withdrawn. His request for more preparation time was denied. However, co-counsel had been on the case fifteen months before trial, providing continuity. Compare *State v. Reynolds* (1998), 80 Ohio St.3d 670, 673-674, 687 N.E.2d 1358, 1365. Moreover, the previous lead counsel agreed to assist Sanders's lawyers during portions of the trial.[7] A trial court has broad discretion over continuance requests, *State v. Unger* (1981), 67 Ohio St.2d 65, 21 O.O.3d 41, 423 N.E.2d 1078, syllabus, and the court here did not abuse its discretion.

### F. Presumption of Prejudice

{¶ 212} Finally, Sanders urges us to hold that the combined circumstances of this case amount to state interference with counsel's ability to render effective assistance. Hence, we are urged to presume prejudice "without inquiry into the actual conduct of the trial." *United States v. Cronic* (1984), 466 U.S. 648, 660, 104 S.Ct. 2039, 2047, 80 L.Ed.2d 657, 668. However, we decline to do so.

{¶ 213} "[T]he right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated. * * * Moreover, because we presume that the lawyer is competent to provide the guiding hand that the defendant needs, * * * the burden rests on the accused to demonstrate a constitutional violation." *Cronic*, 466 U.S. at 658, 104 S.Ct. at 2046, 80 L.Ed.2d at 667; see, also, *id*. at 659, 104 S.Ct. at 2047, 80 L.Ed.2d at 668, fn. 26.

{¶ 214} Nonetheless, *Cronic* recognized that some circumstances are so likely to prejudice the defendant that no showing of prejudice is necessary. These include "the complete denial of counsel * * * at a critical stage of [the] trial" and

---

7. This attorney did not participate in the courtroom proceedings in the trial, but the record does not show whether he gave out-of-court assistance.

the complete failure of counsel "to subject the prosecution's case to meaningful adversarial testing." 466 U.S. at 659, 104 S.Ct. at 2047, 80 L.Ed.2d at 668. "Ineffectiveness is also presumed when counsel 'actively represented conflicting interests.' " *Id*. at 661, 104 S.Ct. at 2048, 80 L.Ed.2d at 669, fn. 28, quoting *Cuyler v. Sullivan* (1980), 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333, 347. Also included are such extreme cases as *Powell v. Alabama* (1932), 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, where defense counsel was appointed only a few minutes before the trial commenced. See *Cronic*, 466 U.S. at 659-661, 104 S.Ct. at 2047-2048, 80 L.Ed.2d at 668-669 (discussing *Powell*).

{¶ 215} "Apart from circumstances of that magnitude, however, there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." *Cronic*, 466 U.S. at 659, 104 S.Ct. at 2047, 80 L.Ed.2d at 668, fn. 26. It is clear to us that no "circumstances of that magnitude" were present in this case. Sanders was vigorously defended by two attorneys, one appointed two months before trial, the other fifteen months before trial. They were not representing conflicting interests. They had investigative assistance and they subjected the state's case to adversarial testing. Sanders's counsel were not denied "the opportunity to participate fully and fairly in the adversary factfinding process." *Herring v. New York* (1975), 422 U.S. 853, 858, 95 S.Ct. 2550, 2553, 45 L.Ed.2d 593, 598.

{¶ 216} The circumstances offered by Sanders to justify a presumption of prejudice, such as concerns about attorney compensation, disagreements between lead counsel and co-counsel, and his transfer from Lebanon to Mansfield, do not approach the magnitude necessary to relieve him of his *Strickland* burden to show that his counsel committed specific errors that caused prejudice to his case.

{¶ 217} Sanders's first, sixth, seventh, and twenty-ninth propositions of law are overruled.

VI. Judicial Bias

{¶ 218} In his thirty-first proposition, Sanders contends that the trial judge was biased against the defense. The presence of a biased judge on the bench is, of course, a paradigmatic example of structural constitutional error, which if shown requires reversal without resort to harmless-error analysis. See *Arizona v. Fulminante* (1991), 499 U.S. 279, 309-310, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302, 331.

{¶ 219} In this case, Sanders cites six occasions when the judge criticized defense counsel before the jury. He cites four occasions when the judge questioned prosecution witnesses in a manner that Sanders perceives as improperly favorable to the prosecution, and two when the judge raised a *sua sponte* objection to defense evidence and argument. Sanders also claims that the judge made "opinionated remarks" in the jury's presence.

{¶ 220} However, "[s]harp words spoken by a trial court to counsel do not by themselves establish impermissible bias. There is a 'modicum of quick temper that must be allowed even judges.' " *United States v. Donato* (C.A.D.C.1996), 99 F.3d 426, 434, quoting *Offutt v. United States* (1954), 348 U.S. 11, 17, 75 S.Ct. 11, 15, 99 L.Ed. 11, 17.

{¶ 221} The judge rebuked defense counsel outside the jury's presence after counsel accused the DRC of "playing games" with the rioters during negotiations. This rebuke does not show bias. Nor does the judge's refusal of requested sidebar conferences.

{¶ 222} Sanders also claims that the judge's unfavorable rulings prove bias. This is incorrect. See, *e.g.*, *In re Disqualification of Hunter* (1988), 36 Ohio St.3d 607, 522 N.E.2d 461. We think that the incidents cited by Sanders fall far short of establishing actual bias on the part of the trial judge.

{¶ 223} Sanders also contends that the judge's behavior in the presence of the jury *displayed* a pro-prosecution bias, thus influencing the jury against Sanders.

{¶ 224} We disagree. In this case, the guilt phase alone produced nearly five thousand three hundred pages of transcript; the entire transcript is over five thousand six hundred pages long. The judge's occasional impatience did not pervade the trial, and the incidents described in Sanders's brief probably left little impression on the jury. See *United States v. Centracchio* (C.A.7, 1985), 774 F.2d 856, 859-860 (seventeen incidents were "all but lost" in two-thousand-page transcript); compare *United States v. Filani* (C.A.2, 1996), 74 F.3d 378 (judge argumentatively questioned testifying defendant sixteen times in sixty transcript pages, challenging his defense theory and personal credibility).

{¶ 225} Sanders's thirty-first proposition is overruled.

## VII. Cumulative Error

{¶ 226} In his thirty-second proposition, Sanders contends that the effect of the errors alleged in this case, even if individually harmless, cumulatively denied him a fair trial. See *State v. DeMarco* (1987), 31 Ohio St.3d 191, 31 OBR 390, 509 N.E.2d 1256. He makes no persuasive showing of cumulative error. This proposition is overruled.

## VIII. Independent Sentence Review

{¶ 227} In Sanders's twenty-second proposition of law, he contends that the death sentence is not appropriate in this case.

{¶ 228} R.C. 2929.05(A) requires us to review Sanders's death sentence independently. We must determine whether the evidence supports the jury's finding of aggravating circumstances, whether the aggravating circumstances outweigh the mitigating factors, and whether the death sentence here is proportionate to those we have affirmed in similar cases. *Id.*

## Aggravating Circumstances

{¶ 229} The aggravating circumstances are that Sanders committed aggravated murder (1) while a prisoner in a detention facility, (2) as part of a course of conduct involving the purposeful killing of, or attempt to kill, two or more

persons, and (3) while committing the crime of kidnapping. See, respectively, R.C. 2929.04(A)(4), (5), and (7). We find that the evidence supports Sanders's conviction of all three specifications.

Mitigating Factors

{¶ 230} In mitigation, Sanders adduced evidence of his history, character, and background.

{¶ 231} Sanders's sister testified about his childhood. His mother never married the father of her four children. She had her first child at age thirteen; when she had Sanders, her third, she was seventeen. Sanders's mother worked to support the children; as a result, Sanders and his siblings were frequently left in the care of the eldest child, who was only four years older than Sanders.

{¶ 232} Sanders had no relationship with his father, who lived with the family for only four or five years and did not work. The father would occasionally stop by to "discipline" his sons. Once, Sanders watched as his father beat Sanders's brother Walter with a belt and made him bleed. When Walter fled, his father threatened him with a gun.

{¶ 233} Sanders got little or no moral instruction at home. He began getting into trouble at age nine and was briefly in a foster home at age ten or eleven. After Sanders was returned to his family, he and his brother Walter were caught burglarizing a gun store. Sanders was then just twelve. He spent eight years in a juvenile detention facility. When he was released, his sister found him "hardened." About fifteen months later, Sanders was arrested for a robbery involving a gun, the crime that ultimately sent him to SOCF.

{¶ 234} Sanders's sister described him as a "loving," "kind, considerate," and "sensitive" brother. She believed that his conversion to Islam was sincere and had made him more humble.

{¶ 235} Five SOCF inmates testified to Sanders's good character. One testified that Sanders had stepped in to prevent a young inmate from homosexual

rape. Another witness told how he had been unjustly accused of being a "snitch," and Sanders "went to bat for" him on numerous occasions. Three inmates testified that Sanders had spoken out against the racist anti-white teachings of a rival Islamic sect. Inmates described Sanders as humble, pious, quiet, studious, and generous. It was even testified that Sanders used his influence to discourage violence.

{¶ 236} Sanders's final witness was Niki Schwartz, a lawyer who mediated between DRC and the rioters in the last days of the siege. Schwartz had dealt with Sanders, Robb, and Lavelle in their capacities as leaders of the three inmate factions. He testified that Robb was the lead negotiator and that Sanders was not "in complete control" of the riot. Moreover, Schwartz described Sanders as a "peacemaker" and did not believe that he was trying to prolong the crisis.

Independent Weighing

{¶ 237} It is clear that Sanders had a bad upbringing, with insufficient supervision and moral instruction and some exposure to violence. This may, to some degree, account for his criminal career. Yet, worse backgrounds than his have been afforded little weight. *State v. Campbell* (1994), 69 Ohio St.3d 38, 54-55, 630 N.E.2d 339, 353-354; *State v. Murphy*, 65 Ohio St.3d at 585-586, 605 N.E.2d at 908; *State v. Cooey* (1989), 46 Ohio St.3d 20, 41, 544 N.E.2d 895, 919; *State v. Holloway* (1988), 38 Ohio St.3d 239, 245-247, 527 N.E.2d 831, 837-839.

{¶ 238} There is evidence to suggest that Sanders has partly overcome his background and developed some good character traits: a loving nature, kindness, courage, generosity, and racial tolerance. Yet Sanders was also capable of viewing human lives as "bargaining chips." And the claims by penalty-phase witnesses that Sanders was a "peacemaker" who deprecated violence are hardly consistent with the crimes proven against him in this case.

{¶ 239} Sanders proffered testimony that the prison administration inflicted "psychological brutality" on the prisoners and hence bore some responsibility for the riot. We regard that factor as potentially mitigating and have considered the

proffered testimony. However, we find that it deserves no weight. Vallandingham's murder was not a response to any "psychological brutality" that may have existed at SOCF. It was a calculated act, undertaken to bend the DRC to Sanders's will. In *State v. Clark* (1988), 38 Ohio St.3d 252, 264, 527 N.E.2d 844, 856, we stated: "Appellant's need for drugs may have led him to rob, but it certainly did not require him to kill in the course of the robbery." Similarly, whatever mistakes prison administrators may have made, Sanders need not have ordered Vallandingham's murder. For the same reasons, we give no weight to the fact that a DRC employee made a public statement that offended the inmates.

{¶ 240} We conclude that the mitigation here, though significant, is outweighed beyond a reasonable doubt by the three proven aggravating circumstances.

## 2. Proportionality

{¶ 241} Sanders's death sentence is proportionate to the death sentence imposed upon Aryan Brotherhood leader Jason Robb for Vallandingham's murder, a sentence we approved in *State v. Robb* (2000), 88 Ohio St.3d 59, 723 N.E.2d 1019. It is also proportionate to death sentences approved for aggravated murders in detention facilities, see *State v. Zuern* (1987), 32 Ohio St.3d 56, 512 N.E.2d 585; for "course of conduct" aggravated murders, see *State v. Combs* (1991), 62 Ohio St.3d 278, 581 N.E.2d 1071; *State v. Allard* (1996), 75 Ohio St.3d 482, 663 N.E.2d 1277; and for aggravated murders during kidnappings, *State v. Seiber* (1990), 56 Ohio St.3d 4, 564 N.E.2d 408.

{¶ 242} The judgment of the court of appeals is therefore affirmed.

*Judgment affirmed.*

DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

_____

*Mark E. Piepmeier*, Special Prosecuting Attorney, and *William E. Breyer*, Assistant Special Prosecuting Attorney, for appellee.

*David H. Bodiker*, State Public Defender, *Kelly L. Culshaw* and *Ruth L. Tkacz*, Assistant Public Defenders, for appellant.

_____