**[Cite as *State v. Reed*, 2024-Ohio-5411.]**

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 2023-CA-69 |
| | : | |
| v. | : | Trial Court Case No. 22-CR-481 |
| | : | |
| KIERSTAN REED | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on November 15, 2024

. . . . . . . . . . .

CARLO C. MCGINNIS, Attorney for Appellant

ROBERT C. LOGSDON, Attorney for Appellee

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-Appellant, Kierstan Reed, appeals from her conviction and sentence on one count of felonious assault, a second-degree felony. According to Reed, the trial court erred in refusing to instruct the jury on self-defense. Reed further contends

her conviction was not supported by sufficient evidence and was against the manifest weight of the evidence. Finally, Reed argues the State committed prosecutorial misconduct during her cross-examination by implying that she was fabricating evidence, and then it exacerbated the misconduct during closing argument by stating that no evidence supported Reed's theory about how the victim's injury had occurred.

{¶ 2} After reviewing the record, we find that the court correctly refused to instruct the jury on self-defense. An instruction was not warranted because Reed failed to meet her burden of providing legally sufficient evidence that she acted in self-defense. Reed's felonious assault conviction was supported by sufficient evidence and was not against the manifest weight of the evidence. Finally, the State did not commit prosecutorial misconduct in cross-examining Reed or during closing argument. Accordingly, the judgment of the trial court will be affirmed.

I. Facts and Course of Proceedings

{¶ 3} This case arose from an altercation that occurred on May 31, 2022. On June 6, 2022, an indictment was filed charging Reed with one count of felonious assault, in violation of R.C. 2903.11(A)(1), a second-degree felony. After Reed pled not guilty, she was released on her own recognizance with a condition that she not have any contact with H.M., the alleged victim. In February 2023, the parties filed an entry of stipulation concerning a polygraph test. Under the stipulation, Reed agreed to submit to a polygraph test to be administered by a polygraph examiner for the Bureau of Criminal Investigation ("BCI"), who would be permitted to testify at trial as an expert concerning all

aspects of the test.   Reed later filed a notice of intent to use self-defense as an affirmative defense at trial.

{¶ 4} Reed was tried in November 2023, and the jury found her guilty as charged. The trial court sentenced Reed to a minimum of three years to a maximum of four and a half years in prison.   Reed appeals from the conviction and sentence.

## II.  Self-Defense

{¶ 5} Reed's first assignment of error states that:

The Trial Court Erred When It Failed to Provide the Jury With Instructions for Self-Defense, in Violation of Appellant's Right to Due Process and Trial as Guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Section 10 and 16, Article I of the Ohio Constitution.

{¶ 6} Under this assignment of error, Reed claims that the trial court erred in refusing to instruct the jury on self-defense.   According to Reed, she presented evidence of self-defense, and the trial court incorrectly found that she could not assert both accidental injury and self-defense.

{¶ 7} As to the self-defense assertion, the evidence presented at the trial was as follows.   The first witness, victim H.M., offered the following testimony.   On May 31, 2022, H.M. was hanging out with Reed, Reed's boyfriend, Jonathan, Reed's children, and Reed's sister, J.R., who was H.M.'s best friend.[1]   Transcript of Proceedings (Jury Trial)

---

[1] Initials will be used to protect the privacy of the witnesses.   However, Jonathan died before trial and did not testify.

("Tr."), 120-121, 127-128, and 130. They went to the Memorial Day parade in the morning, went swimming at Urbana Lake for the majority of the day, and then went to the house where J.R. and J.R.'s sister, B.C., lived. They were celebrating Memorial Day and drinking. *Id.* at 121-122.

{¶ 8} Reed's mother, T.R., also lived at the house and was there that evening. The group arrived around 5:00 or 6:00 p.m. and began drinking tequila. They drank quite a bit, and around 8:00 p.m., H.M. and others in the group drove to Xenia to get another bottle of tequila. *Id.* at 131-135. They returned around 9:30 or 10:00 p.m. and continued drinking. H.M. and J.R. then got into a verbal fight over H.M.'s ex-boyfriend. J.R. was mad because she thought H.M. was going to leave and go hang out with him. H.M. said she was not doing this and walked out on the porch. She then heard J.R. talking about her to J.R.'s sister. At that point, H.M. said, "That's what we're doing" and left. This was around 12:00 a.m. *Id.* at 136-138.

{¶ 9} H.M. felt threatened and felt she had to leave, but she came back because she and J.R. did not normally argue like that. She drove around the block and returned to make things right. During this interval, H.M. called J.R. five times and they were yelling and screaming. *Id.* at 139-141. H.M. parked on the side alley next to the house, went up to the porch, and knocked on the door. Reed opened the door, came out, and shoved and hit H.M. in the arm. H.M. then pushed Reed back and hit her. *Id.* at 144-146. An unknown female then came up behind H.M. H.M. recalled being hit multiple times in the back of the head and that Reed and the unknown female pulled her hair. H.M. dropped to the ground as they were hitting her. Reed then repeatedly punched H.M. in the face.

H.M. tried to cover herself by ducking and using her hands to deflect the assault  *Id*. at 147-150 and 152.

{¶ 10} H.M. stated that she then ran away, but Reed chased her to the car and pulled her out of the car.   At that point, H.M. was on the ground trying to protect herself, and Reed stomped on her legs.   The only thing part of her that Reed could stomp on was her legs, because J.R. was on top of H.M., trying to protect her.   After this happened, H.M. tried to stand up, could not stand, and fell back down.   B.C. then came out and helped H.M. into the car.   The injury to H.M.'s leg occurred at the car, and she suffered a compound fracture.   H.M. drove to her mother's house, and her mother took her to the hospital.   At the hospital, H.M.'s blood alcohol level was tested and it was .24.   Tr. at 124, 165-168, 173, and 175-176.

{¶ 11} Dr. Carozza, an orthopedic surgeon, treated H.M. at the emergency room. The history the emergency room physician took from H.M. at around 1:38 a.m. stated that H.M. had gotten into an argument with her friend, that her friend assaulted her, that she was hit in her head, and that her lower leg was stomped on.   Dr. Carozza saw H.M. several hours later and made his own history at around 7:15 a.m.   *Id*. at 181 and 183-185, and State's Ex. 4.   At that point, it was about 15 minutes before Dr. Carozza's first surgery; he was trying to assess whether he needed to bump other surgeries for that day, and was just getting rough information.   H.M. told him she had gotten into an argument with some friends and that she was uncertain what had happened to her leg, but remembered trying to get into her car and suddenly being unable to use her leg.   *Id*. at 186-187.   The injury showed that H.M.'s leg was struck from the outside and broke in the

opposite direction. That was more consistent with an impact trauma versus a twisting injury. Dr. Carozza's opinion was that H.M. had sustained blunt force trauma from the lateral side, which was consistent with her history that her leg was stomped on. It would not have likely occurred from twisting and slipping in flip-flops, which would have resulted in more of a spiral fracture pattern. *Id.* at 188-189 and 193.

{¶ 12} Sergeant Mercado of the Springfield City Police Department responded to the hospital at around 1:40 a.m. in the early morning hours of June 1, 2022, on a report of an assault. He spoke to H.M, who identified Reed as the person who had assaulted her. Based on the information he received, Sgt. Mercado charged Reed with felonious assault. During the same shift, Mercado went to the house where the incident had occurred based on a noise complaint from neighbors. Mercado found a large gathering and could tell there was drinking involved and a lot of noise. When Mercado was at the house, he was not able to make contact with Reed and J.R., as they were not there. *Id.* at 204-206, 208-209, and 230-232.

{¶ 13} A BCI polygraph examiner, Jim Slusher, conducted a stipulated polygraph examination on Reed on February 16, 2023. The pretest information Slusher received was that Reed denied breaking H.M.'s leg, denied being the one who broke the leg, and denied being in physical contact with H.M. when her leg broke. The three relevant questions Slusher asked Reed were: (1) whether she broke H.M.'s leg; (2) if she was the one who broke H.M.'s leg; and (3) if she was in physical contact with H.M. when H.M's leg broke. Tr. at 248, 253, and 258. Slusher conducted three tests, which were all peer-reviewed by another BCI polygraph examiner who analyzed the charts without any

prior knowledge. The testing procedure was that both examiners would form an opinion and exchange them electronically at the same time; if the examiners did not agree, the report was deemed inconclusive. *Id.* at 260-262. During the test, Reed responded no to all three relevant questions. Per BCI policy, Slusher's report stated that specific reactions indicative of deception appeared in Reed's charts when she responded to relevant questions asked during the exam. Consequently, the report further said it was to be considered that Reed was not telling the truth during the tests as to the relevant questions Slusher had articulated. *Id.* at 262-263 and State's Exs. 6 and 7.

{¶ 14} At trial, the defense introduced testimony from four witnesses who were present the evening of the alleged assault. These witnesses were: Reed, Reed's sisters, B.C. and J.R., and Reed's mother, T.R. According to B.C., after they left the lake, they stopped at a liquor store and bought a liter of tequila. After they got to J.R.'s house, she, J.R., and H.M. began drinking shots around 6:30 or 7:00 p.m. They finished the bottle in about an hour and a half, and H.M. left around 10:00 p.m. to get more tequila. H.M. got back around 11:30 p.m. and consumed about ten shots of that bottle; she was pretty drunk, and no one else was drinking. *Id.* at 301-305. After the shots, they were all listening to music, and H.M. was asked to turn the radio down because the children were asleep. H.M. then began getting aggressive and cussing, and J.R. told H.M. it was time for her to go. H.M. went outside and B.C. went to her bedroom. *Id.* at 306-307.

{¶ 15} Later that evening, B.C. heard a loud altercation and came outside. As soon as B.C. came outside, she saw H.M. running to her car. B.C. testified that H.M. was wearing flip-flops, and as she ran toward the car, one (apparently one flip-flop) went

in one direction, and H.M.'s body slid under the car. B.C. went to assist H.M., and when she helped H.M. off the ground, H.M. could not stand. B.C. saw blood coming down H.M.'s leg, knew it was broken, and tried to call an ambulance. However, H.M. refused. H.M. then opened the passenger door, did a "butt-hop" to the driver's side, and started the car. No one else was around the car. *Id.* at 309-310.

{¶ 16} The next day, H.M. called B.C. about her belongings and was initially going to have her mother pick them up. During the conversation, H.M. said she had been dragged out of her car and beat up. B.C. responded that this was not what had happened, and stated that B.C. had been there for H.M. and had wanted to get her help. Tr. at 311-312.

{¶ 17} Reed testified next and said she had not been drinking that evening. She went with H.M. and J.R. to the liquor store because she was the only one who was sober. When they returned to the house around 11:15 p.m., everyone was calmed down and Reed's children were asleep. Reed went outside with her boyfriend, Jonathan, and when she came back inside, H.M. kept turning up the music. J.R. asked H.M. multiple times to turn it down. Reed went back outside; when she returned, J.R. and H.M. were in each other's faces, and J.R. asked H.M. to leave. It was close to midnight. H.M. then began calling J.R.'s phone, threatening J.R., telling J.R. that she hated her, and telling J.R. that she was going to pull up and fight her. H.M. called four or five times. Reed told her sister to just not answer the phone, and they would fix it tomorrow. J.R. and H.M. were both intoxicated, and Reed felt nothing would be resolved by fighting or arguing. *Id.* at 334-335.

{¶ 18} About 20 minutes later, Reed saw headlights. She instantly went to the front door and locked the screen door. H.M. yanked the door open, came into the house, and punched Reed in the face. Reed then pushed H.M. out, and H.M. came at Reed again, slapping her in the face. At that point, Reed hit H.M. once and grabbed H.M's hair, holding her down so she could not punch Reed anymore. They were both standing at that time. J.R. came outside and tried to break the fight up. While people were separating Reed and H.M., Reed fell on top of H.M. *Id.* at 335, 337, and 339-340. When asked if H.M. possibly broke her leg at that point, Reed stated, "It may be possible. It may be possible." Id. at 340. Reed denied ever stomping on H.M.'s leg. *Id.*

{¶ 19} According to Reed, when the fight was broken up, H.M. took off running to her car, and she saw H.M. slide under the car. Reed denied that anyone pulled H.M. out of the car and said B.C. was the only one who approached H.M., which was to pick H.M. up from under the car. Tr. at 341. Reed further explained that, because H.M. fell while they were fighting, that caused her concern during the lie detector test. In this vein, Reed said:

> That's why, because when they asked me did I do it, I could have. I didn't intentionally do it, but it may have happened when we did fall. . . . I didn't know, did I do it or I didn't do it. I was nervous and I was scared the whole time. I wasn't, just wasn't sure if I did do it and I didn't want to say I didn't do it and not really do it.

Tr. at 342.

{¶ 20} Reed further testified that she did not break H.M.'s leg and was not the one

who broke H.M.'s leg. *Id.* She then said that she had been in physical contact with H.M. and did not know when H.M. broke her leg, but it was possibly because she fell on top of H.M. *Id.* at 342. When asked if H.M. tried to cover herself by ducking and using her hands to deflect the assault, Reed responded: "Honestly I don't even remember her doing that because once I grabbed her hair, it was over after that. I pulled her down so she couldn't hit me anymore and we both fell. They got us separated and she ran." *Id.* at 344. Reed also denied that H.M. had a limp when she ran away and said she suspected that H.M. broke her leg when she slid under the car. Reed stated that she had no doubts about that at all. *Id.* at 345-346. Reed stressed that she did not see any slowness when H.M. got up after they fell; H.M. "got straight up and ran straight to her car." *Id.* at 359.

{¶ 21} Reed's mother, T.R., lived at the house with her daughters and was present the night of the injury. Contrary to Reed, she testified that Reed, J.R., H.M., and B.C. had all been drinking that night and taking shots. Id. at 362-363 and 365. T.R. was in her bedroom when she heard yelling. She went to the screen door and saw H.M. outside. Jonathan was outside the door, between H.M. and Reed. Reed was holding the screen door, and H.M. was trying to get through Jonathan to get in the front door. H.M. was yelling, "I'm going to beat her ass." H.M. then shoved Jonathan aside, pulled the screen door open, entered the house, and hit Reed. *Id.* at 371-374.

{¶ 22} At that point, Reed grabbed H.M. to get her out of the house. H.M. began trying to kick Reed, but Reed was too far away. Reed had ahold of H.M.'s hair, and by this time, J.R. and T.R. were on either side trying to get Reed off H.M.'s hair. According

to T.R., no one fell on the ground. She stated that H.M. was standing on the porch ramp when she finally got away and ran down the ramp straight to her car. When H.M. got to the gravel, she slid across the gravel and her leg went underneath the car. H.M. then walked around the car, got in the driver's side, and drove off. Although B.C. went over to help H.M. and offered to call an ambulance, H.M. refused and said she did not want anyone called. Tr. at 376-378 and 383.

{¶ 23} J.R. also testified; she stated that H.M. had been her best friend for a long time, but they were no longer friends because of this incident. *Id.* at 387-388. Like her mother, J.R. said that Reed had been drinking that night. Reed had about a shot or two from the first liter of tequila. After they got back with the second liter, Reed, H.M., J.R., and Jonathan drank the second liter, doing shots. *Id.* at 390 and 392. H.M. drank the most, and J.R. and H.M. got into an altercation because H.M. kept turning the music up louder and louder. J.R.'s mother was getting upset because the music was so loud. When J.R. said H.M. needed to turn it down, H.M. started being aggressive. As a result, J.R. told her to go home. H.M. was angry because J.R. asked her to leave. *Id.* at 393.

{¶ 24} About 20 minutes after leaving, or at around 12:22 a.m., H.M. started calling J.R. During the first call, H.M. told J.R. that she hated her and they were no longer friends. At 12:24 a.m., H.M. called and said she was coming back. However, J.R. said it was not a good idea and told her not to come back. At that point, H.M. was yelling but did not make any threats. H.M. called again at 12:25 a.m., but J.R. did not answer the phone. *Id.* at 395-397. J.R. was in the kitchen when H.M. arrived. J.R. did not see what was happening, but when things escalated, she went to the front door. H.M. and

Reed had already made their way out to the ramp. *Id.* at 398.

{¶ 25} All J.R. saw was hair-pulling; Reed and H.M. were pulling hair and smacking each other. J.R. jumped right in the middle and hovered over the top of them, as H.M. was her best friend and she did not want her to get hurt. At that point, J.R. was the one getting hit, and there were no injuries to anyone's legs. Jonathan, J.R., and her mother separated the two women, and H.M. took off running to her car. When H.M. ran on the gravel on the driveway, her flip-flop broke, and she slid under the car. At that time, H.M. hopped back up like nothing was wrong. However, H.M.'s ankle was hanging and she was standing on it like nothing was wrong. B.C. helped H.M. off the ground, H.M. sat in the passenger seat, got into the driver's seat, and then drove off. According to J.R., there was only one fight. She did not see anyone stomping on H.M.'s leg, and no one pulled H.M. out of the car. *Id.* at 399-401.

{¶ 26} Reed argues she was entitled to a self-defense instruction because evidence was presented that, if believed by the jury, would have supported the claim that she acted in self-defense. Specifically, Reed points to her own testimony that the injury to H.M.'s leg could have occurred when she and H.M. fell to the ground. Thus, Reed contends the trial court erred in relying on the testimony of defense witnesses that the injury occurred near H.M.'s vehicle when H.M. slipped and fell.

{¶ 27} In reviewing decisions denying requested jury instructions, the proper standard is "whether the trial court abused its discretion under the facts and circumstances of the case." *State v. Palmer*, 2024-Ohio-539, ¶ 16, citing *State v. Wolons*, 44 Ohio St.3d 64, 68 (1989). " 'A self-defense claim includes the following

elements: (1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he [or she] was in imminent danger of death or great bodily harm and that his [or her] only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger.' " *State v. Messenger*, 2022-Ohio-4562, ¶ 14, quoting *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002).

{¶ 28} As applicable here, R.C. 2901.05(B)(1) states that:

A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

{¶ 29} In 2019, the General Assembly amended R.C. 2901.05 and modified burden-of-proof standards for self-defense. *Palmer* at ¶ 17. The Supreme Court has clearly held, even after the amendment, that " 'self-defense is still an affirmative defense and that the burden of production is still on the defendant.' " *Id.* at ¶ 18, quoting *Messenger* at ¶ 21. Furthermore, because of this, "a trial court does not err by requiring a defendant to present qualitative evidence supporting each element of self-defense," and "the state's burden of persuasion is not triggered until the defendant produces 'legally

sufficient evidence' for every self-defense element." *Id.* at ¶ 19, quoting *Messenger* at ¶ 19 and 25.

{¶ 30} This standard is similar to what is used to evaluate sufficiency of the state's evidence and provides that " 'if the defendant's evidence and any reasonable inferences about that evidence would allow a rational trier of fact to find all the elements of a self-defense claim when viewed in the light most favorable to the defendant, then the defendant has satisfied the burden.' " *Id.* at ¶ 20, quoting *Messenger* at ¶ 25. The production burden is not heavy and " 'might even be satisfied through the state's own evidence.' " *Id.*, quoting *Messenger* at ¶ 22.

{¶ 31} In *Palmer*, the court stressed that "[w]hen determining whether evidence is sufficient, a trial court must consider only the adequacy of the evidence presented – not its persuasiveness. . . . The question is not whether the evidence should be believed but whether the evidence, if believed, could convince a trier of fact, beyond a reasonable doubt, that the defendant was acting in self-defense." (Citations omitted.) *Id.* at ¶ 21.

{¶ 32} Applying those standards here, Reed presented sufficient evidence that she acted in self-defense when H.M. came to the door of the house and attempted to enter. At that time, she appears to have forcibly pushed H.M. out of the door and, at least per her testimony, in the process, to have hit H.M. in response to being hit. If the State had charged Reed with assault for what occurred on the porch, Reed would have been entitled to a self-defense instruction, and the trial court made that point when it discussed the self-defense instruction. Tr. at 425-426 and 432. However, that is not the crime with which Reed was charged.

{¶ 33} As noted, the State charged Reed with felonious assault, in violation of R.C. 2903.11(A)(1). This statute provides that: "(A) No person shall knowingly . . . (1) Cause serious physical harm to another or to another's unborn." The statute does not define serious physical harm, but R.C. 2901.01(A)(5) states, in pertinent part, that: " 'Serious physical harm to persons' means any of the following: . . . (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity; (d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement; [or] (e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain."

{¶ 34} The only injury that potentially fits any of these definitions is the injury to H.M.'s leg. It was a compound fracture, the bone was sticking out of H.M.'s leg, and it was very painful. Tr. at 175. At the emergency room, H.M. described the pain from her leg as "constant, stabbing, severe"; she was also admitted to the hospital. *Id.* at 186-187. H.M. sustained a transverse fracture of the tibia or the shin bone, which is the main weight-bearing bone in the lower leg, a transverse fracture of the fibula, which is the outside bone extending from the outside of the ankle to the outside of the knee, and a butterfly fragment fracture on the inside of the leg, meaning the leg was struck from the outside and then broke in the opposite direction. Surgery was required, and H.M. had to get a metal rod replacement from her knee to her leg. *Id.* at 124-125, 188-190, and 199, and State's Ex. 4.

{¶ 35} During trial, the parties and court extensively discussed the issue of whether

a self-defense instruction should be given. *See* Tr. at 423-435. Ultimately, the court denied the defense request for this instruction. However, the court said it would readdress the matter if needed after the State's closing argument. *Id.* at 435.

{¶ 36} During the discussion, the following exchange occurred:

THE COURT: . . . And Mr. Edwards [defense counsel], I'm going to turn to you. It's my understanding that the self defense instruction, there has to be some evidence of, that the injury was caused by self defense.

My belief at this point, unless you can convince me otherwise, is that all of the testimony from the independent witnesses, even Ms. Reed herself, was that the injury was caused at the vehicle because of an accident, not because of anything Ms. Reed did.

MR. EDWARDS: I, there was some inconsistencies in [H.M.'s] testimony that I would note that it was very difficult to discern that, and if the jury is going to be instructed that a use of unreasonable force was caused at some point, I think would be important that the jury is aware that she was trying to break into the house and an altercation occurred.

THE COURT: That's not what I'm talking about.

MR. EDWARDS: Okay.

THE COURT: I'm talking about simply the self defense instruction. Self defense, the Court does not have to give a self defense instruction unless there's sufficient evidence that was introduced that, if believed, would raise a question in the minds of reasonable jurors concerning the

existence of self defense.

A trial court may not refuse a requested instruction if it's correct, but it still has to be appropriate to the facts of the case and it's within the sound discretion of the Court to determine whether the evidence is sufficient to require the jury instructions.

In fact, the trial court cannot give a jury instruction on the affirmative defense of self defense if there is insufficient evidence to support that finding. And what I'm saying is that [J.R., B.C., T.R.] all testified that the injury occurred as [H.M.] was running away and slid on her flip-flops on the gravel and hit the car and that's when the injury occurred, with [J.R.] testifying that it was so bad that it was kind of dangling and that you could actually see that her ankle was, or her leg at that time was broken.

And so what the court is saying is that with that being the testimony, there's no crime that was committed on the porch. The criminal act that we're being charged with is the crime that allegedly happened at the vehicle, which your client and all of the witnesses are completely denying that they were at the vehicle when the injury occurred.

MR. EDWARDS: The State is not alleging that though. They're alleging that she got stomped on during the fight.

THE COURT: At the car.

MR. HESKETT [Counsel for the State]: At the car. The State would agree, your Honor, and wouldn't ask for the unreasonable force

[instruction].

Tr. at 424-426.

{¶ 37} Following this exchange, Reed's counsel agreed that self-defense would not apply if the injury occurred when H.M. ran away and slipped on the gravel. In addition, the defense *said it was not saying the injury occurred on the porch during the fight. Id.* at 427-428. The defense then argued, however, that the State failed to prove where the injury occurred because the victim gave inconsistent stories.

{¶ 38} At trial, H.M. testified that after the initial fight on the porch, she ran to her car, but Reed pulled her out of the car and continued to hit her. At that point, H.M. was face down, with pressure on top of her, and could not see much. She felt hitting, and after the attack happened, she went to stand up, could not stand, and fell back down. H.M. further stated that Reed was the one who assaulted her at the car. Tr. at 123-124.

{¶ 39} At the emergency room at 1:38 a.m., H.M.'s statement was that "she got into a disagreement with her friend, and her friend assaulted her; states she was hit in the head as well as her right tib fib, which is the lower leg was stomped on." *Id.* at 184-185 (Dr. Carozza's testimony); *see also* State's Ex. 3 (the emergency room record). H.M. did not specify a location where this occurred. At around 1:39 a.m., H.M. gave a statement to Sgt. Mercado. H.M. identified Reed as her assailant and said she had gotten hit in the face several times, had been kicked a couple of times, had her hair pulled, and had been slammed to the ground. *Id.* at 206, 208, 220, and 234. Mercado filed a felonious assault charge because H.M. told him that Reed had stomped on her leg and he saw "good battle damage on her leg." *Id.* at 239. H.M.'s leg was in a cast at the time. *Id.* at 240.

{¶ 40} When Dr. Carozza took H.M.'s history at around 7:15 a.m. that day, H.M. stated that "she got into an argument with some friends. She's uncertain as to what happened to her right leg, but she remembers trying to get into her car and suddenly became unable to use her leg." *Id.* at 186-187 (Dr. Carozza's testimony); State's Ex. 4 (Dr. Carozza's notes of his examination of H.M.). The same day, H.M. called B.C. and asked if her mother could come to get items from the house. During the conversation, H.M. told B.C. that her leg had been injured when she was dragged out of the car; as previously noted, B.C. told H.M. that she was mistaken. Tr. at 177-178; Defense Ex. S (video recording of call between H.M. and B.C.).

{¶ 41} At trial, H.M. was cross-examined about what she had told Sgt. Mercado at the hospital. While the testimony was a bit confusing, H.M. told the officer that she had parked her car and gone up to the porch, and Reed had begun assaulting her at that point. H.M. further told the police that an unknown female had assaulted her from behind, that her hair had been pulled by the unknown female and Reed, that she (H.M.) dropped to the ground, and that she tried to cover herself by ducking and using her hands to deflect the assault. Tr. at 145-147, 149-150, and 152-153. H.M. also testified that she had told the police she was pulled out of the car to the ground. However, the police report did not reflect this. *Id.* at 153 and 162. The police report did indicate that Reed had slammed H.M. to the ground, and H.M. stated at trial that this was when she was pulled out of the car. According to H.M., at that point, J.R. was on top of her trying to protect her, and Reed was kicking H.M.'s legs because that was the only thing she could reach. *Id.* at 163-164 and 165-167.

{¶ 42} While there were some differences in H.M.'s accounts, these were primarily due to incomplete discussion given the circumstances. For example, at the emergency room, H.M. stated that her leg had been "stomped on," and there would have been no reason to go into a detailed explanation at that time. Likewise, the officer who visited the hospital took an account giving him sufficient cause to believe Reed had caused the injury. The officer could have investigated further, but when he visited the house later that night on a noise complaint, no one reported that H.M. had assaulted someone, had trespassed, or had damaged any property. H.M. also did tell B.C. the day of the incident that she had been dragged from her car.

{¶ 43} Nonetheless, all the defense witnesses testified that H.M.'s leg had been injured when she slipped and fell at her car. This was completely inconsistent with a theory that H.M. may have been accidentally injured when Reed fell on her at the porch. Although Reed offered her fear that she "may" have injured H.M. in this way as a possible explanation for her deceptive polygraph results, no other witness testified that this had occurred. Furthermore, Reed specifically testified, despite this speculation, that she had not broken H.M.'s leg and that she had not been in physical contact with H.M. when H.M.'s leg was broken. Tr. at 329 and 342-343.

{¶ 44} All the defense witnesses also testified that the fist fight on the porch or on the ramp to the porch had been broken up, that H.M. had run from or down the ramp on the house to the car, and that H.M. had slid under the car. *Id.* at 309 and 316 (B.C.); 341 and 344 (Reed); 377 (T.R.); and 398 and 400 (J.R.). All the witnesses who were asked about it denied that H.M. had even limped while running. *Id.* at 312 (B.C.); 345 (Reed);

and 411 (J.R.) (who also stated that, by the way H.M. took off running, she was fine).   In contrast, B.C. testified that when she had gone to help H.M. off the ground at the car, H.M. could not even stand.   *Id.* at 310.   J.R. also described H.M.'s ankle as "just hanging" after she fell at the car.   *Id.* at 400.   Again, these descriptions were completely inconsistent with a theory that Reed may have caused the injury when they fell to the ground by the porch.   Had this caused the injury, H.M. would not have been able to run from the porch or ramp to the car.   According to pictures of the scene, the car was parked on the opposite side of the house from the porch and the ramp.   *See* Defense Exs. M, N, and P.   In other words, H.M. would have run at least the width of the house and a few feet beyond to even get to her car.

{¶ 45} In this vein, we note again that during the self-defense discussion, defense counsel stated a number of times that the injury did not occur on the porch.   Tr. at 426-427.   After counsel made these statements, the following further discussion occurred:

MR. HESKETT [State]:   The injury was at the car where the victim testified that she was drug out of the car.

MR. BAMBERGER [also Defense]:   But that was just one of the stories that was given, and the jury heard all three of them, one of which was that she was beaten right on the porch, right at the door, which would have been self defense.

MR. HESKETT:   But she's [Reed's] not saying that she caused the serious physical harm.   She's in fact denying that she caused the serious physical harm or that it was accidental.   So if it's accidental, it's not self

defense. If she didn't do it, she's saying she didn't do it, so it's not confession and avoidance.

MR. BAMBERGER: But the jury heard testimony from the victim, the alleged victim that she was beaten on the porch. They heard that. They're going to be talking about that back there, and that ties to self defense. The two other stories the victim told had nothing to do with that, true. But the Defendant would be prejudiced if she filed the affirmative self defense claim and then couldn't use it when the victim said, one of her stories was that it was right there at the door.

THE COURT: But your witnesses are testifying that it was at the car.

MR. BAMBERGER: Right, but –

THE COURT: Just because you file, just because you file a motion for affirmative defense, there has to still be evidence presented that would at least be – and again, I want to use the correct terminology here – gives sufficient evidence if introduced, if believed, would raise a question in the minds of the jurors concerning the issue of such an issue. And what I'm saying here is your client and all the witnesses testified that the injury happened at the vehicle itself.

MR. EDWARDS: All the defense witnesses.

THE COURT: Yes.

MR. EDWARDS: Right.

MR. BAMBERGER: But if the victim itself, one of the stories she gave was that it happened right on the porch and the jury heard that. That would tie to self defense.

THE COURT: But her testimony, and as you guys pointed out, was inconsistent, her testimony was that it happened at the car when she was pulled out of the vehicle.

MR. BAMBERGER: That was one of her stories.

THE COURT: And when did she testify to the other stories?

MR. EDWARDS: When she testified, the statement she gave to the police officer.

. . . .

THE COURT: Right. And that was a statement she gave to the police officer, correct?

MR. EDWARDS: Right.

THE COURT: And that wasn't what she testified to today. That came out on cross-examination.

MR. EDWARDS: And she didn't deny she said that. She just said I was unsure of what happened.

MR. BAMBERGER: And the police report is in the evidence that –

MR. EDWARDS: No.

THE COURT: No, it's not.

MR. BAMBERGER: Well, again, the jury heard one of the stories

that implicates self defense, so they might believe that story.

THE COURT:    But I guess, do you understand what self defense is? And I'm not trying to be – I'm not trying to be facetious, but self defense in itself is you have a right to self defense to cause, and you can cause bodily harm to save yourself from bodily harm.

MR. BAMBERGER:    At her screen door, yes.

THE COURT:    Right.    So if they had charged her with assault and we were dealing with the assault at the screen door, that would be a self defense case, but the question becomes, because of how the witnesses testified that the injury was an accident when she slid into the car, that is not self defense.    That was not created by self defense. That was created by an accident.

THE COURT:    How do you argue – how do you argue in closing in self defense, well if you think my client did it, it was self defense, but if it happened at the car, then that was an accident.    Do you see self defense is, the underlying pinning of self defense is that you admit, you're admitting to creating the situation.    And in no way has the Defendant admitted to creating the situation.    I'm having a hard time finding where the testimony of your witnesses created a, that created a, where there's sufficient evidence when your witnesses testified that that's not how the injury occurred.

MR. BAMBERGER:    Well, that's what the Defense witnesses say,

and if the jury instruction says that the only place where the felonious assault might have taken place is at the car, then that's fine, self defense is not implicated.   But if there's any inference that could be taken back that it might have happened at the door—

THE COURT:   No, it's not an inference. It has to be –

MR. BAMBERGER:   Well, the victim itself gave that inference.

MR. EDWARDS:   It was my understanding the State was conceding that the injury did, only occurred at one location, and that was by the car. Is that my understanding of the State's position?

MR. HESKETT:   That's what I believe the evidence supports.

MR. BAMBERGER:   If that's the case, and the jury is clear about that, then yeah, self defense is off the table.

MR. EDWARDS:   I concur.

THE COURT:   So I guess here would be the Court's ruling, is that if the – I guess I can revisit the issue after closing arguments of whether or not the State tries to extend where the incident happened to either the car or the -- so if the State would make the argument, ladies and gentlemen, because there was [sic] conflicting stories, if you believe the injury occurred here or here, you're still going to find her – then I think we would have another issue.

But I just didn't get from the testimony that that's where any of us were really going that it happened on the porch; more so that it happened

when she hit that car and then she had a dangling ankle. I mean –

MR. HESKETT: I'm not going to argue the serious physical harm occurred on the porch.

MR. BAMBERGER: Well, that point just has to be made clear.

MR. HESKETT: Well, I believe the evidence supports exactly what the victim –

MR. EDWARDS: Again, if at closing that's brought up, I can phrase my closing to address that.

Tr. at 428-435.

**{¶ 46}** Following this discussion, the court said that it would deny the motion for a self-defense instruction but would readdress the issue if needed after the State's closing argument. *Id.* at 435. During closing argument, the State did not argue that the injury occurred anywhere other than at the car, and the defense did not renew its request or ask the court to revisit the matter of the self-defense instruction. In view of the above discussion, the trial court did not make a credibility decision; instead, it properly found that no sufficient evidence of self-defense existed.

**{¶ 47}** According to Reed, jury instructions should be allowed on inconsistent defenses. In a case Reed cites, a court of appeals stated that "the Ohio Supreme Court has conflicting precedents on whether a trial court must give jury instructions when the defendant has requested jury instructions that go to inconsistent defenses." *State v. Imondi*, 2015-Ohio-2605, ¶ 19 (11th Dist.). The three cases the Eleventh District mentioned were *State v. Champion*, 109 Ohio St. 281 (1924), *State v. Martin*, 21 Ohio

St.3d 91 (1986), and *State v. Mundt*, 2007-Ohio-4836. *Id.* at ¶ 19-22. The court then said, "[i]n light of *Mundt*, we cannot read *Champion* and *Martin* as requiring a defendant to admit the state's case in chief in order to argue self-defense. If arguing inconsistent defenses is a trial tactic that a competent trial attorney would utilize, then the jury should be instructed on the inconsistent defenses." *Id.* at ¶ 22.

{¶ 48} Mundt was a death penalty case in which the defendant alleged trial counsel was ineffective during the sentencing phase by presenting "testimony that contradicted their theory of the case during the guilt phase." *Id.* at ¶ 122. The testimony in question was from psychologists who had interviewed the defendant and to whom he had given inconsistent stories. Specifically, the defendant told them: (1) he had raped the child victim but had not murdered her; (2) he had placed the child in a well (where she died) and had acted alone; and (3) the child's mother was the primary aggressor and he and his half-brother had taken the child's body to the well. *Id.* at ¶ 123-125. The jury recommended that the defendant receive the death penalty, and the trial court sentenced him to death. *Id.* at ¶ 45.

{¶ 49} The Supreme Court of Ohio rejected the ineffective assistance claim, stating that: "Mundt's contention 'the jury may have 'harbored . . . doubt as to the level of [Mundt's] involvement' amounts to speculation and is insufficient to show prejudice. Mundt's guilt-phase theory – that Mundt had raped [the child], but that [the mother], Johnny Mundt [the half-brother], or someone else had kidnapped and murdered her – is implausible and unsupported by credible evidence." *Id.* at ¶ 132. The same observation applies here. For the reasons previously stated, Reed's claim that she

"may" have accidentally injured H.M. by falling on her on the porch was both implausible and unsupported even by Reed's own testimony.

{¶ 50} Furthermore, in a case decided after the self-defense statute was amended, the Supreme Court of Ohio stressed that: "For nearly 100 years, this court has held that self-defense 'presumes intentional, willful use of force *to repel force or escape force*." (Emphasis in original.)   *State v. Wilson*, 2024-Ohio-776, ¶ 18, quoting *Champion*, 109 Ohio St. at 286-287.   The court interpreted this to mean "that the use of force must be intentional – not accidental."   *Id.*    Thus, even if Reed's speculation were supported by the evidence (which it was not), a self-defense instruction was not warranted.   The most that might be inferred is that an accident occurred and Reed did not intend to cause harm.

{¶ 51} Accordingly, the first assignment of error is without merit and is overruled.

### III.   Manifest Weight and Sufficiency of Evidence

{¶ 52} Reed's second assignment of error states that:

> Appellant's Conviction for Felonious Assault Should Be Reversed Because the Evidence Was Insufficient and It was Against the Manifest Weight of the Evidence.

{¶ 53} Reed combined this assignment of error with the first assignment of error and did not argue it separately.   However, she did contend under the first assignment of error and for the reasons stated that the evidence at trial was insufficient and did not prove her guilt beyond a reasonable doubt.   " 'Whether the evidence is legally sufficient to sustain a verdict is a question of law.' "   *State v. Groce*, 2020-Ohio-6671, ¶ 7, quoting

*State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). "In a sufficiency-of-the-evidence inquiry, the question is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *Id.*, citing *State v. Jenks*, 61 Ohio St. 3d 259 (1991), paragraph two of the syllabus, *superseded by constitutional amendment on other grounds, State v. Smith*, 80 Ohio St.3d 89, 102, fn. 4 (1997).

{¶ 54} In contrast, "[w]hen a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Hill*, 2013-Ohio-717, ¶ 8 (2d Dist.), quoting *Thompkins* at 387. "A judgment should be reversed as being against the manifest weight of the evidence 'only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 55} "Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." (Citation omitted.) *State v. McCrary*, 2011-Ohio-3161, ¶ 11 (10th Dist.). Consequently, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." *State v. Braxton*, 2005-Ohio-2198, ¶ 15 (10th Dist.).

{¶ 56} Having reviewed the entire record, we conclude that the judgment is supported by the weight of the evidence and therefore is supported by sufficient evidence. H.M. testified at trial that Reed had dragged her out of her car and stomped on her leg, causing the severe injury. The medical evidence also supported a conclusion that the injury was caused by blunt force trauma to the leg and not the twisting motion that would have occurred if H.M. had slipped and fell as the defense contended. This is not the exceptional case in which the judgment must be reversed to avoid a manifest miscarriage of justice. The second assignment of error is overruled.

IV. Prosecutorial Misconduct

{¶ 57} Reed's final assignment of error states that:

The State of Ohio's Conduct During Trial Constituted Prosecutorial Misconduct, Which Deprived Defendant of a Fair Trial and Due Process.

{¶ 58} Under this assignment of error, Reed contends the prosecution improperly cross-examined her by implying she was fabricating evidence because she did not present a theory before trial about falling on top of H.M. According to Reed, the prosecution then exacerbated its misconduct during closing argument by stating there was no evidence to support Reed's theory and that the trial court would not be giving an instruction on self-defense.

{¶ 59} "The test for prosecutorial misconduct is whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused." *State v. Jones*, 90 Ohio St.3d 403, 420 (2000), citing *State v. Smith*, 14 Ohio St.3d 13, 14 (1984).

"The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.' " *Id.*, quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982). However, Reed never objected to any such alleged error in the trial court. *See* Tr. at 357 and 467. In that situation, alleged misconduct is reviewed only for plain error. *Mundt*, 2007-Ohio-4836, at ¶ 169. *See also State v. McAlpin*, 2022-Ohio-1567, ¶ 157 and 159 (failure to object to prosecutorial misconduct forfeits error other than plain error).

{¶ 60} "To be 'plain' within the meaning of Crim.R. 52(B), an error must be an 'obvious' defect in the trial proceedings." *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002), quoting *State v. Sanders*, 92 Ohio St.3d 245, 257 (2001). In addition, "the error must have affected 'substantial rights,' " which means the "error must have affected the outcome of the trial." (Citations omitted.) *Id.* The Supreme Court of Ohio has also stressed, however, that plain error review is discretionary, and that plain error may be noticed " 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.' " *Id.*, quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶ 61} Again, having reviewed the record, we find no such error. During Reed's cross-examination, the State mentioned that this was the first time Reed had ever advanced the theory that she fell on H.M. and may have accidentally caused the injury. Tr. at 357. While a defendant has the right not to testify, Reed chose to do so here, and she also stipulated to the results of a lie detector test. In the latter regard, the State confirmed with Reed that the examiner operating the test gave her an opportunity to ask questions and "go back and forth." *Id.* This is also evident from the video of the

polygraph test, when the examiner fully explained all aspects of the process to Reed, allowed her to ask any questions, and stressed she could consult with her attorney if she had questions. *See* State Ex. 7(A). Given these facts, the State could properly question why Reed had failed to previously mention that H.M.'s injury was accidentally caused by a fall.

{¶ 62} As to the closing argument, the prosecutor told the jury that the defense did not want it to look at the evidence but to look elsewhere, such as the fact that H.M. drove to get more alcohol when she was intoxicated. In this context, the prosecutor remarked that the jury could see for itself what the evidence was. *Id.* at 356-357. The prosecutor then said: "When you know what that picture is, you know that she [Reed] did it. You're not getting a self defense instruction because there's no evidence to support it. She's saying she didn't do it." *Id.* at 357. This was not an improper statement. As noted earlier, Reed testified that she had not broken H.M.'s leg, that she had had no physical contact with H.M. that caused the broken leg, and that she had no doubt that the accidental fall at the car caused the injury.

{¶ 63} Accordingly, there was no evidence of prosecutorial misconduct and nothing that would cause reversal on this ground. Reed's third assignment of error is overruled.

V. Conclusion

{¶ 64} All of Reed's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

EPLEY, P.J. and TUCKER, J., concur.